UNITED STATES of America, Appellee,

v.

Geraldo HERNANDEZ, also known as Gerardo Hernandez, also known as Juan Hernandez, Defendant–Appellant.

No. 1543, Docket 91–1028.

United States Court of Appeals, Second Circuit.

Argued June 3, 1991.

Decided Aug. 8, 1991.

**134**

Christopher P. Reynolds, Asst. U.S. Atty., S.D.N.Y. (Helen Gredd, Asst. U.S. Atty., S.D.N.Y. and Otto G. Obermaier, U.S. Atty., S.D.N.Y., of counsel), for appellee.

Barry C. Scheck, New York City (Lawrence A. Vogelman and Ellen Yaroshefsky, of counsel), for defendant-appellant.

Before OAKES, Chief Judge, PRATT and ALTIMARI, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Defendant Geraldo Hernandez appeals from a judgment convicting him of violating 18 U.S.C. § 922(g), which makes it a crime for a felon to possess a firearm. Hernandez conditioned his guilty plea on the right to appeal the district court's denial of his motion to suppress the handgun that served as the basis for his § 922(g) conviction. Hernandez secondarily argues that if his conviction is not entirely vacated, he should at least be resentenced, because the district court "ignored and violated fundamental Guideline procedure" in sentencing him to 90 months' imprisonment.

We reject Hernandez's challenge to the district court's suppression ruling. We also reject his arguments regarding the district court's upward departure in sentencing; however, because the district court based its determination of Hernandez's criminal history category on the circumstances surrounding his present conviction, we remand the case for resentencing.

## BACKGROUND

In late 1989 a warrant was issued for Hernandez's arrest on a parole violation. On December 11, 1989, based on an informant's tip, two deputy marshals staked out an apartment in Manhattan, on West 36th Street between Ninth and Tenth Avenues. After a few hours, they saw Hernandez, along with two other men they did not recognize, pull up and get out of a grey Cadillac. Hernandez was carrying a black attache case, and as one of the marshals testified, Hernandez "kept pulling up his belt, like something was falling". To the deputy marshals, this suggested that Hernandez was carrying a gun, and this observation, together with their knowledge of Hernandez's previous conviction for illegally trafficking in weapons, led them to conclude that Hernandez was armed and dangerous.

After Hernandez and the two men entered the apartment building, the deputy marshals called for a backup; approximately ten deputy marshals responded. They divided into three groups: one group was to surround the building, to prevent Her-

nandez from escaping; a second group was to arrest Hernandez; the third group was to engage in a protective sweep of the apartment, to ensure the safety of the arresting deputy marshals.

The deputy marshals twice knocked on the door of the apartment and identified themselves as the "police". Receiving no response, the deputy marshals broke down the door. As they entered the apartment, they found Hernandez in the living room and immediately arrested him.

One deputy marshal, who was part of the protective-sweep team, entered a bedroom that was immediately to the right of the front door. There he discovered a woman, later identified as Betty Barrow, on the bed. The deputy marshal ordered her to stand up and raise her hands. He then handcuffed her, and temporarily placed her on the floor between the bed and a dresser. As he did this, he ran his hand across the top of the bed, underneath the bed, and between the mattress and the box spring. He also searched the drawers of a dresser next to the bed. He did all this because he planned to place Barrow on the bed, where she would be more comfortable, and where it would be easier to watch her. As the deputy marshal ran his hand between the mattress and the box spring, however, he discovered a loaded .357 magnum revolver.

In plain view, other deputy marshals also discovered a beeper, a cellular phone, a bag of currency, and a triple beam scale.

After Hernandez was indicted for possessing a weapon in violation of 18 U.S.C. § 922(g), he moved to have the gun and the other items found in the apartment suppressed, arguing that their discovery was the result of an illegal search in violation of the fourth amendment. Following an evidentiary hearing, the district judge denied the motion in an order dated June 11, 1990.

Three days later, Hernandez pled guilty, reserving his right to appeal the denial of his suppression motion, see Fed.R.Crim.P. 11(a)(2), and was subsequently sentenced to 90 months' imprisonment, followed by a three-year term of supervised release, and a $50 special assessment.

Hernandez appeals.

## DISCUSSION

On appeal, Hernandez raises two issues—denial of his suppression motion, and improper sentencing under the guidelines. For the reasons that follow, we affirm the district court's denial of Hernandez's suppression motion, but remand for resentencing because the district court incorrectly determined Hernandez's criminal history category.

### A. *The Suppression Motion.*

█ Hernandez contends that the actions of the deputy marshals exceeded the bounds of a proper "protective sweep" under the doctrine set out by the Supreme Court in *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). "A 'protective sweep' is a quick and limited search of a premises, incident to an arrest and conducted to protect the safety of police officers or others." *Id.*, 110 S.Ct. at 1094. The district court concluded that the search of the bedroom area around Barrow, which led to discovery of the gun, was part of a proper protective sweep and, therefore, was not in violation of the fourth amendment.

Hernandez claims that the district court improperly extended the scope of a protective sweep by approving of a search that extended beyond a visual search for dangerous individuals. According to Hernandez, a protective sweep should be limited to "a search for people in places where they may be hiding, not a search in drawers and within furniture where weapons might be hidden." We do not think a protective search is so narrowly limited.

As the district court correctly pointed out, *Buie* is only the most recent in a succession of cases that seek to balance concerns for the safety of arresting officers with the fourth amendment rights of citizens. *Buie* cannot be read in isolation, for its holding draws heavily from *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). Significantly for our purposes, in

all three cases the Court applied the same balancing test to different factual situations. *See Buie*, 110 S.Ct. at 1097–99. ("The ingredients to apply the balance struck in *Terry* and *Long* are present in this case.") *Id.* at 1097.

In *Terry*, the Court allowed an on-the-street frisk for weapons by an officer when the officer believed, based on "specific and articulable facts", that a person was armed and dangerous. *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. In determining that the search was proper, the Court applied a reasonableness test:

> [T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Id.* at 27, 88 S.Ct. at 1883 (citations omitted).

In *Long*, the Court extended the rationale of *Terry* to a search of the passenger compartment of a car, following a stop of that car. Applying the same balancing test that it had applied in *Terry*, the Court concluded that " 'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger' ". *Long*, 463 U.S. at 1050, 103 S.Ct. at 3481 (quoting *Terry* ). For this reason, the Court held that the search of the car was proper. *Long*, 463 U.S. at 1050–51, 103 S.Ct. at 3481. The Court further noted that as long as the area search "is limited to a search for weapons in circumstances where the officers have a reasonable belief that the suspect is potentially dangerous to them", the search is proper. *Id.* at 1052 n. 16, 103 S.Ct. at 3482 n. 16.

In both *Terry* and *Long,* the Court was "concerned with the immediate interest of the police officers in taking steps to assure themselves that the persons with whom they were dealing were not armed with or able to gain immediate control of a weapon that could unexpectedly and fatally be used against them." *Buie*, 110 S.Ct. at 1097.

In *Buie*, the Court applied *Terry's* balancing test to an arrest of a suspect in the suspect's house. There, police officers had obtained an arrest warrant for Buie and his accomplice, whom they suspected of committing an armed robbery. *Id.* at 1095. After verifying that Buie was home, six or seven officers went to his house. They entered the house, and fanned out through the first and second floors. A single officer went to the basement stairs, and in a loud voice ordered anyone in the basement to come out. *Id.* Eventually Buie emerged from the basement, and he was searched and handcuffed. Thereafter, another officer went down into the basement to see if anyone else was there. While searching the basement, the officer discovered physical evidence that linked Buie with the crime. *Id.*

The trial court refused to suppress the evidence, as did the Court of Special Appeals of Maryland. *Id.* However, the Court of Appeals of Maryland reversed, concluding that the search had violated the fourth amendment. *Id.* at 1095–96. The Supreme Court, in turn, vacated the judgment of the Court of Appeals of Maryland, holding that the officer's actions were part of a proper protective sweep. *Id.* at 1095.

In applying the balancing test of *Terry* and *Long* to a protective sweep of a suspect's home, the Court stated that

> [t]he Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Buie*, 110 S.Ct. at 1099–100. Thus, the questions that we are instructed to focus on are (1) whether the search was "properly limited", and (2) whether it was reasonable for the deputy marshal to conclude that Barrow posed a danger to those on the arrest scene.

Taking the second question first, there is no doubt, given the situation, that it was reasonable for the deputy marshal to believe Barrow to be dangerous and that specific and articulable facts supported that belief; indeed at oral argument, Hernandez conceded that the deputy marshal had the right to seize Barrow and handcuff her.

Hernandez, therefore, rests his challenge to the suppression ruling on his claim that the protective search was not "properly limited". According to Hernandez, once the deputy marshal had handcuffed Barrow and determined that no one else was in the room, his protective search should have ended. The handcuffed Barrow was no longer a threat, he argues, and since no other "armed and dangerous" individual could be hiding in the area, the deputy marshal had no basis for any further search of this area, particularly between the box spring and mattress, where no person could possibly hide.

The district court rejected Hernandez's argument, and upheld the deputy marshal's search of the "grab area" around Barrow, including his quick check under the mattress. As the district court stated, "If Barrow were left unattended even for a short period of time and knew where the gun was, it would not be an impossible task even for one handcuffed from behind to work her hands between the mattress and the box spring and grab the weapon." *United States v. Hernandez*, 738 F.Supp. 779, 782–83 (S.D.N.Y.1990). This finding was not clearly erroneous.

Thus, even though Barrow had been handcuffed, it was proper for the deputy marshal to search the area around her for weapons. To begin with, the search lasted "no longer than [was] necessary to dispel the reasonable suspicion of danger". *Buie*, 110 S.Ct. at 1099. Moreover, the whole point of a protective sweep is to ensure "that the house in which a suspect is being or has just been arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id.* at 1098. Having found and subdued just such a person—Barrow—the deputy marshal still could check the immediate area in order to "neutralize the threat of physical harm", *Terry*, 392 U.S. at 24, 88 S.Ct. at 1881, by determining whether there were weapons within Barrow's reach. *Cf. Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969) ("There is ample justification * * * for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."). While it is true that government agents engaged in a protective sweep may not engage in a full search of the premises, but only in a search that extends "to a cursory inspection of those spaces where a person may be found", *Buie*, 110 S.Ct. at 1099, this does not mean, as Hernandez suggests, that a protective search can involve a search only for individuals and not for weapons within the grab area of an individual whom the government agents have reasonably concluded is dangerous.

In *Long*, the Court refused to adopt an argument similar to the one advanced by Hernandez. In that case, the Michigan Supreme Court had concluded that the search of the car had violated the fourth amendment because at the time of the search, the defendant was effectively under the control of the officers, and that therefore a search of the car was unnecessary and improper. *Long*, 463 U.S. at 1051, 103 S.Ct. at 3481. The Court explicitly rejected this analysis, and instead concluded that in a close encounter between government agents and a person whom they believe is dangerous, government agents are not required to "adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter." *Long*, 463 U.S. at 1052, 103 S.Ct. at 3482.

For these reasons, we agree with the district court that the circumstances of this case "fit comfortably within the principles" of *Buie*, *Long*, and *Terry*. *Hernandez*, 738 F.Supp. at 782. "[A] reasonably prudent" officer would have believed that Barrow posed "a danger to those on the arrest scene"; the quick search of the area around Barrow, even after she was handcuffed, was a reasonable and proper at-

tempt to "neutralize the threat of physical harm." *Terry,* 392 U.S. at 24–27, 88 S.Ct. at 1881–83.

### B. *Sentencing.*

Hernandez received a sentence of 90 months' imprisonment, a three-year term of supervised release, and a $50 special assessment. He claims that the district judge erred both in determining his criminal history category and in imposing a significant upward departure after determining his base offense level. We find no error in the district court's upward departure from his offense level, but because we conclude that the district court erred in determining Hernandez's criminal history category, we remand for resentencing.

In a thoughtful and detailed opinion and order, the district judge explained his reasons for arriving at a sentence of 90 months. As the district court pointed out, after factoring in Hernandez's acceptance of responsibility, the adjusted offense level for his conviction for violating § 922(g) was 10 and his criminal history category was IV. Applying the guidelines grid, these factors together would indicate a term of imprisonment of between 15 and 21 months. However, the district court concluded that a "substantial upward departure" was warranted "both with respect to the offense level and with respect to the criminal history category, with the result that defendant has been sentenced to 90 months imprisonment."

Hernandez attacks these upward departures. He argues that in reaching the final sentence, the district court incorrectly determined his criminal history category and the offense level departure. As to the criminal history category, Hernandez contends that the district court (1) "violated fundamental Guideline procedure by departing upwards as if he were a career offender," even though the district court had expressly determined that he could not be sentenced as a career offender; (2) erred in basing his criminal history category on current conduct as well as past conduct; and (3) failed to consider category V

in jumping from category IV to category VI.

As to his offense level departure, Hernandez argues that the district court (1) incorrectly based its upward departure on uncharged acts of misconduct; (2) based this departure on insufficient evidence; and (3) was guilty of "double counting" when it upwardly departed based on conduct that had already been accounted for in the base offense level.

### 1. Determination of Criminal History Category.

The district court initially determined that Hernandez's criminal history category was IV. However, the district judge stated:

When a defendant with * * * [Hernandez's] history commits an offense whose surrounding circumstances, particularly when considered in relation to those past convictions, make it plain that he would be fairly sentenced as a career offender if those surrounding circumstances could be considered, it is entirely consistent with the structure of the Guidelines, including the career offender provisions, to depart upward, at least with respect to criminal history category, to that category specified by the Sentencing Commission for career offenders, category VI, without considering intervening category V.

This is not a matter of Hernandez having done almost enough to qualify as a career offender and therefore being treated as one based on a "near miss." Rather, it is plain that when one considers what the Sentencing Commission itself determined in general to be "relevant conduct," *i.e.,* "acts * * * committed * * * by the defendant or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction," U.S.S.G. § 1B1.3(a)(1), Hernandez, by employing a weapon in aid of drug trafficking, has done everything necessary to qualify as a career offender. It is reasonable to depart upward at least to ap-

ply the criminal history category of such an offender.

*United States v. Hernandez*, 753 F.Supp. 1191, 1199 (S.D.N.Y.1990) (citations omitted).

■ Under the guidelines, an individual sentenced as a career offender is automatically assigned a criminal history category of VI. U.S.S.G. § 4B1.1. In assigning Hernandez this category, the district judge made it clear that he was not attempting to sentence Hernandez as a career offender, but was instead relying on relevant conduct. However, while it is proper for a district court to consider some relevant conduct in determining a defendant's criminal history category, it may do so only with respect to the circumstances surrounding the defendant's prior convictions, and not with respect to the current offense.

Relevant conduct is discussed in § 1B1.3 of the guidelines, where a distinction is drawn between the relevant conduct that is applicable to offense conduct level (covered in Chapter Two) and adjustments to offense levels (covered in Chapter Three) on the one hand, and the relevant conduct that applies to criminal history and criminal livelihood (covered in Chapter Four), and the determination of the sentence (covered in Chapter Five) on the other hand. For offense conduct and adjustments, § 1B1.3(a)(1), in sweeping language directs that "all acts and omissions committed or aided and abetted by the defendant" may be considered, whereas for criminal history, criminal livelihood, and the determination of the sentence, the relevant conduct that may be considered is limited to "the conduct and information specified in the respective [chapters of the] guidelines." § 1B1.3(b). From this it follows that the type of relevant conduct applicable in determining the criminal history category is sharply limited to those specific types of conduct that are specified in the particular guidelines sections. Section 1B1.3(a)(1) applies only to offense conduct and adjustments, and it was incorrect for the district court to rely on that section as authorization for its increase in Hernandez's criminal history category.

■ It is § 4A1.3 that articulates the conduct relevant for determining criminal history, and that section makes it clear that only prior conduct may be considered. *See* § 4A1.3(a)–(e). While the section allows the sentencing judge to consider a defendant's "likelihood of recidivism," *see* § 4A1.3, comment. (backg'd.), this determination, too, should be decided on the basis of the defendant's prior conduct only. In short, current criminal conduct should not be used in determining a defendant's criminal history category; the "history" to be considered is prior conduct. *See United States v. Cervantes*, 878 F.2d 50, 53 (2d Cir.1989) (In calculating a defendant's criminal history category, the district court must "determine which category best encompasses the defendant's *prior* history, and * * * use the corresponding sentencing range for that category to 'guide its departure.'") (emphasis added); *United States v. Sappe*, 898 F.2d 878, 882 (2d Cir.1990) ("[A]n upward departure may be warranted when the criminal history category significantly under-represents the seriousness of the defendant's criminal history.")

It may well be that under a correct analysis of Hernandez's prior criminal history, his criminal history category should be VI; however, the district court cannot properly reach that conclusion by considering, as it did, current, uncharged conduct; instead, it should weigh only Hernandez's prior criminal history. An upward departure in a defendant's criminal history category should only occur

> [w]here * * * "prior acts" are "similar" to the offense of conviction and the criminal history category does not "adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes," the sentencing judge may make a part 4A departure by selecting a sentencing range applicable to a defendant with a higher criminal history category.

*United States v. Kim*, 896 F.2d 678, 683 (2d Cir.1990) (citations omitted).

Because the district court erred in determining Hernandez's criminal history category based on current, uncharged conduct, there is no need to discuss whether the district court adequately stated the reasons for moving from category IV to category VI of criminal history. Because we are remanding for resentencing, however, we do address the issues that Hernandez raises regarding his offense level, in order to avoid reconsideration of those issues on any subsequent appeal, should there be one.

2. Determination of Offense Level.

■ Hernandez argues that the district court incorrectly determined an upward departure in his offense level. We reject this argument.

The district court granted Hernandez a two-point reduction for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, but then upwardly departed because of his conclusion that Hernandez had used a weapon in dealing drugs. In considering Hernandez's offense level, the district court concluded that "based on both the amount of money and on the presence of the triple beam scale * * * [I find that] Hernandez was dealing in what the government has called a 'white powder' drug of the sort usually weighed out on such a sensitive scale—*i.e.,* cocaine or heroin." *Hernandez,* 753 F.Supp. at 1199.

In determining the extent of the upward departure called for by this "relevant conduct" based on the offense of conviction, the district court attempted "to approach as closely as possible the standards set by those who have fixed the sanctions for what Hernandez actually did." *Id.* In making this determination, the district judge looked outside the guidelines, to 18 U.S.C. § 924(c)(1), which prescribes a five-year mandatory minimum for a defendant who uses a weapon in the course of committing a drug offense. This five-year sentence shall be "in addition to the punishment provided for such crime of violence or drug-trafficking crime * * *." § 924(c)(1). As a result, after determining Hernandez's base offense level, the district court then added to it a departure measured by this five-year mandatory sentence.

Hernandez contends that in doing this, the district court ignored the procedures for upward departures set out in *Kim. See Kim,* 896 F.2d at 681–86. He also claims that there are "no persuasive reasons or authority for imposing a sentence from 'outside the Guidelines.'"

In determining the extent of its upward departure, the district judge explicitly referred to *Kim,* and we believe that his careful explanation satisfies that case's requirements for upward departures. The resulting sentence, based on the mandatory minimum set by congress in § 924(c) for the offense that would apply to Hernandez's relevant conduct, did not exceed what Hernandez would have received had he been convicted under § 924(c), which was one of our concerns in *Kim. See Kim,* 896 F.2d at 684.

Another question is whether the ultimate sentence is reasonable. If the district court finds, as it did here, "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines * * * ", the court may impose a sentence outside the range of the guidelines. 18 U.S.C. § 3553(b); *see also,* U.S.S.G. § 5K2.0. In reviewing such a sentence, we must determine that it is not "unreasonable". *See* 18 U.S.C. § 3742(f)(2); *United States v. Correa–Vargas,* 860 F.2d 35, 36–37 (2d Cir.1988). We also "have recognized a 'wide discretion' in the district judge to consider and determine what circumstances might justify * * * [an upward] departure." *United States v. Colon,* 905 F.2d 580, 584 (2d Cir.1990) (citations omitted).

Under these principles, we have no trouble in concluding that this upward departure in offense level was reasonable. The district judge carefully considered all the factors surrounding Hernandez's conviction, determined that the guideline range was insufficient and that some upward departure was warranted, and then, in attempting to determine how much of a de-

parture was fair, looked to a federal statute that directly addressed the conduct that served as the basis for the upward departure. The district court found: "[T]he aggregate prison sentence imposed on Hernandez is 90 months. I believe this sentence is reasonable when one considers that the maximum term of imprisonment for the offense to which Hernandez pleaded guilty is 10 years * * *." *Hernandez*, 753 F.Supp. at 1200. The district court's use of the statute as a guide was proper, and the resulting offense level was reasonable.

■ Hernandez also contends that using § 924(c), even as a reference point in sentencing, when he was not convicted of that crime, violates due process. However, since it is clear that the district court had the authority to make some upward departure, and since it used § 924(c) only as an aid in determining a fair and reasonable sentence, there was no due process violation. The district judge satisfied the requirements both of § 3553(b) and of the guidelines developed in *Kim*.

### 4. Sufficiency of the Evidence.

■ Hernandez next contends that there was insufficient evidence to support the district court's findings that he was involved in "white powder" drug trafficking, and that the gun was used in connection with this activity. According to Hernandez, "there simply was not enough evidence of a predicate drug offense to support a § 924(c) conviction", since "mere possession of a weapon in an apartment known to contain narcotics paraphernalia does not automatically lead to a finding of 'use' as required under § 924(c)."

The district court's finding regarding the use of the weapon is subject to the "clearly erroneous" standard. *See* 18 U.S.C. § 3742(e)(4); *United States v. Lanese*, 890 F.2d 1284, 1291 (2d Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990). We have previously held "that a weapon is used in connection with drug trafficking if it is kept on hand to protect [an] 'apartment as a storage and processing point for large quantities of narcotics.'" *United States v. Torres*, 901

F.2d 205, 241 (2d Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990) (citation omitted); *see also, United States v. Alvarado*, 882 F.2d 645 (2d Cir. 1989), *cert. denied*, — U.S. —, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990); *United States v. Meggett*, 875 F.2d 24 (2d Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 166, 107 L.Ed.2d 123 (1989).

Hernandez admitted that he had the gun for "protection", and this admission, together with the discovery in the apartment of more than $35,000 in cash, the portable telephone, the beeper, and the scale, amply support a finding that the gun was used in drug trafficking. The district court's finding was thus not clearly erroneous.

### 5. The Base Offense Level and "Double Counting".

■ Hernandez's final argument is that the district court erred in twice counting his possession of the weapon in determining his sentence. We reject this argument. The district judge first determined Hernandez's base offense level. To do this, he was required to apply the actual conviction—possession of a weapon by a felon—to the guidelines. But as discussed above, the district judge also concluded that an upward departure was warranted because he found that the weapon had been used in drug trafficking. This improper "use" is separate and distinct from the conduct forming the basis of conviction—mere possession of the weapon—and there is therefore no reason to conclude that the same activity was applied twice by the district court in determining Hernandez's sentence.

### CONCLUSION

We reject Hernandez's arguments regarding his suppression motion, and affirm his conviction. We also reject Hernandez's challenges to the sentence insofar as they are directed at the upward departure in his offense level. However, because the district court incorrectly used current conduct to determine Hernandez's criminal history category, we remand the case for resentencing. If the court on resentencing should determine, based on Hernandez's

past conduct alone, that a lower criminal history category is called for, then a different, lower guideline range would result. If that lower range should also produce a lower base sentence, to which the 60–month upward departure in offense level may be applied, then the total sentence would be reduced. If the district court, after fixing a correctly-based criminal history category, should determine that the same base guideline sentence is indicated, then, of course, the resulting final sentence would be the same.