UNITED STATES of America

v.

Jackie FULLER and Derrick Leonard, Defendants.

No. 92–CR–167C.

United States District Court, W.D. New York.

Oct. 12, 1993.

Dennis C. Vacco, U.S. Atty., William J. Hochul, (Asst. U.S. Atty., of counsel), Buffalo, NY, for Government.

Paul Volcy, Buffalo, NY, for defendant Jackie Fuller.

David R. Addelman, Buffalo, NY, for defendant Derrick Leonard.

CURTIN, District Judge.

For the reasons expressed in open court on October 6, 1993, the motion of defendant to suppress certain evidence and to overrule the decision of United States Magistrate Judge Carol E. Heckman is denied. The decision of the Magistrate Judge is affirmed.

The trial now set for November 1, 1993, at the request of both parties, is adjourned until November 15, 1993. The court will meet with counsel on October 22, 1993, at 9 a.m.

So ordered.

## REPORT AND RECOMMENDATION

HECKMAN, United States Magistrate Judge.

Pretrial motions were referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

Defendants Derrick A. Leonard and Jackie Fuller are charged in a three-count indictment with possession of heroin and cocaine with intent to distribute in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2 (Counts I and II), and use of a firearm in relation to a drug trafficking crime in violation of Title 18 U.S.C. §§ 924(c) and 2 (Count IV). Following indictment, both Defendants moved to suppress evidence seized in a search of Defendant Fuller's residence on July 9, 1992. A hearing was held on December 15, 1992 and January 7, February 9, and February 10, 1993. Following the conclusion of the testimony, the parties requested an opportunity to submit additional briefs. Oral argument took place on April 29, 1993.

For the reasons set forth below, Defendants' motion should be denied.

### BACKGROUND

On July 8, 1992, Defendant Fuller was indicted along with 25 other Defendants in *U.S. v. Donald Green, et al.*, 92–CR–159C. Based on the indictment, the Government obtained an arrest warrant for Fuller, who resides at 426 Jefferson Avenue, Apartment G, Buffalo, New York.

On the morning of July 9, 1992, special agents of the F.B.I. and other law enforcement agents went to Fuller's residence. During the course of a protective sweep of Fuller's apartment, agents observed quantities of cocaine and heroin, bundles of U.S. currency and a Cobray Mac 11 machine pistol. Based on the observations of the narcotics and the currency, the F.B.I. obtained a search warrant for Fuller's residence. The search revealed rounds of ammunition.

F.B.I. Special Agent Brian Cid testified at the suppression hearing that he was a 14-year member of the F.B.I. who had worked on narcotics investigations for the last eight years. He testified that he was in charge of the arrest team that arrested Defendants Fuller and Leonard. The other members of the arrest team assigned were F.B.I. Special Agents Wendy Horth and David Tottenhagen, Buffalo Police Detective Brian Lockwood and Erie County Deputy Sheriff Dennis Fitzgibbon. Prior to the arrest, Agent Cid was advised that the Fuller residence might possibly contain automatic or semi-automatic weapons as well as up to one-half kilogram of cocaine (Tr. 1 at 3–7).[1]

On July 9, 1992, Agent Cid and other members of the arrest team proceeded to Fuller's residence, arriving at approximately 6:48 a.m. Agent Horth remained outside the apartment building, while the other four members went to Ms. Fuller's door. Upon announcing their presence, a woman who identified herself as Jackie Fuller allowed the agents to enter the apartment. Ms. Fuller was only partially dressed (Tr. 1 at 8, 37).

Upon entry, Agent Cid observed another adult, later identified as Yvonne Quarles, and an infant. Quarles told Cid that Fuller's boyfriend was in the shower, and that other children were sleeping in one of the two bedrooms in the apartment. Cid proceeded into the apartment down a short hallway and entered the bathroom where he observed an individual, later identified as Defendant Leonard, standing in the shower. Leonard wore no clothes, his upper torso was dry and

---

1. "Tr. 1 at ___" refers to the transcript of the December 15, 1992 proceedings; "Tr. 2 at ___" refers to the January 7, 1993 proceedings; "Tr. 3 at ___" refers to February 9, 1993 proceedings; and "Tr. 4 at ___" refers to the February 10, 1993 proceedings.

he had no soap on his head or body (Tr. 1 at 8–10).

Agent Cid testified that as he entered the bathroom, he noticed a trash can close to the shower with an object on top wrapped in Saran Wrap. It appeared to consist of "two or three small silver colored glassine bags the types usually used for crack cocaine containing a white substance" (Tr. 1 at 10). Agent Cid stated that he did not touch the contents of the trash can in order to make these observations (Tr. 1 at 10).

After securing Leonard, Agent Cid went into a bedroom where Detective Fitzgibbon advised him that he had observed large amounts of money. The bed was a waterbed which had several drawers underneath it. Agent Cid observed an open drawer inside of which were men's clothes as well as several bundles of U.S. currency. Agent Cid testified that he did not move the drawer or disturb its contents in order to make this observation (Tr. 1 at 13–14).

Cid identified Government Exhibits 2 and 3, photographs of the drawer of Fuller's bed reflecting the U.S. currency and assorted garments of men's clothing. Cid also identified as Government Exhibit 1, a photograph of the wastepaper basket found in the bathroom with the Saran Wrap and glassine objects in it (Tr. 1 at 18–20).

After making these observations, Cid went into the kitchen to use the telephone to contact F.B.I. Special Agent Paul Moskal to obtain a search warrant. At about the same time, he observed very large cupboards which in his opinion were large enough to conceal a person. Opening a door to the large cabinet, Agent Cid discovered a Cobray machine pistol. Agent Cid identified Government Exhibit 8, a photograph of his observations upon opening the kitchen cabinet (Tr. 1 at 25–29).

Erie County Sheriff's Department Detective Dennis Fitzgibbon testified that he had been employed by the Sheriff's Department for 13 years, five of which were spent investigating narcotics cases. Fitzgibbon stated that after entering the apartment, he went into Defendant Fuller's bedroom where he noticed a drawer to a waterbed "partially ajar." In the drawer, he observed what appeared to be bundles of American currency. He testified that he did not disturb the drawer or its contents (Tr. 2 at 44–46).

Sometime later, Fuller was taken into her bedroom by Special Agent Horth to get dressed. Fitzgibbon testified that he was present when Fuller asked for her purse from Special Agent Horth. He followed Fuller and Agent Horth to the doorway of the master bedroom where Fuller's purse was located, at which time Agent Horth lifted the purse and exposed a bundle of glassine envelopes to Fitzgibbon's view. Detective Fitzgibbon identified Government Exhibit 5, a photograph of a small bundle of glassine envelopes observed by Fitzgibbon on the floor in the immediate vicinity of Fuller's purse (Tr. 2 at 48–51).

Special Agent Horth was called as a defense witness. She testified that she entered Fuller's apartment approximately two minutes after the arrest team (Tr. 2 at 8). Twenty-six minutes after the agents first knocked on the door, Agent Horth took Fuller to the bedroom so that Fuller could dress, with Fuller pointing out which clothes she wanted to wear. One of the garments was in the closet. Because of the tight space in the bedroom, Agent Horth asked Fuller's permission to move Fuller's purse which was hanging on the doorknob of the closet. Horth moved the purse from the door handle of the closet down to the floor in the doorway of the bedroom, at which time she proceeded to get out Fuller's clothes and check them for weapons (Tr. 3 at 14–15).

Agent Horth noticed glassine packets of suspected narcotics when she moved the purse. She first observed the suspected narcotics when she took the purse by the strap and put it around the corner of the door, dropping it to the floor. Horth did not see the drugs come out of the purse, but rather saw the drugs next to the purse when she placed the bag on the floor (Tr. 3 at 24–26).

The defense concluded their case by calling Yvonne Quarles and Derrick Leonard. These witnesses testified that they were held in the living room of the apartment during the "protective sweep," and they heard the opening of doors and drawers in the bedroom

area and in the kitchen. Defendants Leonard and Fuller also testified that the agents looked into the refrigerator, on top of the refrigerator, in several kitchen cabinets, underneath a microwave stand, in the washing machine, and even in the fish tank in the hall.

## DISCUSSION

Defendants argue that the search of the apartment at the time of Defendants' arrest went far beyond the permissible scope of a "protective sweep" or "security sweep," and that therefore the search warrant affidavit contained false statements in that it represented that the search was a lawful security sweep.

### A. THE JUSTIFICATION FOR A SECURITY SWEEP

The standards governing a security sweep were set forth by the Supreme Court in *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). Law enforcement officers may conduct a protective sweep of a residence during the course of an arrest if they possess "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337, 110 S.Ct. at 1099–1100; *U.S. v. Mickens*, 926 F.2d 1323, 1328 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 940, 117 L.Ed.2d 111 (1992); *U.S. v. Agapito*, 620 F.2d 324, 335–336 (2d Cir.), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980). The purpose of a protective sweep is to assure the arresting officers "that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Maryland v. Buie, supra,* 494 U.S. at 333, 110 S.Ct. at 1097. Accordingly, the scope of a protective sweep is limited to "a very quick and limited pass through the premises to check for third persons who may destroy evidence or pose a threat to the officers." *U.S. v. Agapito, supra,* 620 F.2d at 335.

Defendants argue that the police officers in this case did not have "a reasonable belief based on specific and articulable facts" that Defendant Fuller's apartment contained an individual posing a danger to the police officers on the arrest scene. Specifically, Defendants point to the peaceful conduct of the occupants of the apartment and the lack of advance notice that anyone other than Ms. Fuller and her children would be present in the apartment.

Defendants' arguments notwithstanding, the security sweep was justified in this case. Special Agent Cid testified that he had received prior information before the arrest that there "could possibly be up to a half 'key' of cocaine in the residence and possibly automatic or semi-automatic weapons." (Tr. 1 at 7). Furthermore, the indictment upon which Fuller was arrested charges numerous violent felonies, including kidnapping, murder, and drive-by shootings. Although Ms. Fuller was not personally charged with acts of violence, she was charged as a member of the narcotics conspiracy, along with many of the Defendants who were charged with violent conduct. The F.B.I. was therefore justified in taking precautions to protect themselves from other possible occupants of the apartment at the time of Fuller's arrest.

Defendants cite two Second Circuit cases in support of their position. The first case, *U.S. v. Medina*, 944 F.2d 60 (2d Cir.1991), is not applicable because it did not involve a protective sweep. Instead, the question was whether police officers were justified in entering the defendant's residence without a warrant based on exigent circumstances.

The second case, *U.S. v. Hernandez*, 941 F.2d 133 (2d Cir.1991), is likewise inapposite. The question before the Court was whether the police officers were justified in continuing to search the immediate "grab area" of the defendant even after the defendant was handcuffed. Balancing the concerns for the safety of the arresting officers against the Fourth Amendment rights of citizens, the Second Circuit held that the search of the area around the defendant, even after she was handcuffed, was a reasonable, proper attempt to "neutralize a threat of physical harm. . . ." *Id.* at 137 (quoting *Terry v. Ohio*, 392 U.S. 1, 24, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968)). In *Hernandez*, in contrast to this case, it was conceded that the police had reason to believe that the defen-

dant was dangerous and that specific and articulable facts supported that belief. The question presented was one of the scope of a search incident to arrest.

### B. THE SCOPE OF THE SECURITY SWEEP

The next argument raised by Defendants is that the search conducted by the police officers prior to obtaining the warrant exceeded the permissible scope of a protective sweep. As a result, they argue, the search warrant became the fruit of a prior illegal search. Based on this, Defendants maintain that the evidence seized in executing the search warrant as well as the evidence seized prior to the search must be suppressed.

The first question is thus whether the affidavit in support of the search warrant contains information derived from an illegal search. If so, then it must be disregarded and the affidavit must be evaluated without regard to the unlawfully obtained information. *Laaman v. U.S.*, 973 F.2d 107, 111 (2d Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

Here, the affidavit in support of the search warrant makes no reference to the semiautomatic weapon found in the kitchen cabinet. Accordingly, it is unnecessary to address Defendants' contention that this weapon was discovered as a result of an illegal search. This gun would have been discovered in any event after the search warrant was obtained.

This leaves, then, three items of evidence which are referred to in ¶¶ 6–8 of the search warrant affidavit: the plastic bag containing rock cocaine, the U.S. currency contained in an open dresser drawer, and the glassine envelopes containing heroin found near Defendant Fuller's purse. Each shall be addressed in turn.

#### 1. *The Plastic Bag Containing Rock Cocaine*

■ Paragraph 6 of the Moskal affidavit states as follows:

> While conducting the protective sweep of the bathroom, the agents observed an open waste container and further observed that

the waste container contained one plastic bag, and inside that plastic bag were two smaller silver plastic bags each of which contained what appeared to [Special Agent] Cid to be .10 gram rocks of cocaine.

■ It is clear that during the course of the protective sweep, agents are entitled to seize contraband in plain view. *Maryland v. Buie, supra,* 494 U.S. at 330, 110 S.Ct. at 1096. There is no question that the protective sweep properly included the bathroom, where agents were told that Defendant Leonard was taking a shower.

As to the cocaine observed in the bathroom, Defendants failed at the hearing to demonstrate any reason why this Court should not credit the testimony of Special Agent Cid, who testified that the package was in plain view. Defendants concentrate on alleged inconsistencies in Agent Cid's description of the bag in the wastepaper basket. Agent Cid initially described the bag as "some Saran Wrap-like thing" including "two or three small silver colored glassine bags ... containing a white substance" (Tr. 1 at 10; *see also* Tr. 1 at 11, 51). In later testimony, when the package was subpoenaed for the hearing, Cid acknowledged that the contents of the bags appeared to be a darker color.

Defendants argue that the package was not immediately recognizable as narcotics because of the ambiguity as to the color of the contents. This argument must be rejected. Agent Cid testified that he was a 14–year member of the F.B.I. who had worked in narcotics-related investigations for approximately eight years, that he has become familiar with the methods of packaging narcotics such as cocaine and heroin and that he had participated in arresting in excess of 200 individuals in drug investigations (Tr. 1, pp. 3–5).

Defendants also speculate that this evidence was placed in plain view by a member of the arrest team. There is no support for this in the record.

#### 2. *The U.S. Currency*

■ Paragraph 7 of the Moskal affidavit states in pertinent part as follows:

While conducting the protective sweep of the bedroom, the agents observed dresser drawers in the open position and noticed that one of the drawers contained a plastic bag with approximately five 2–inch high stacks of United States currency containing $20, $50, and $100 bills.

As already stated, the agents had a right to go into the bedroom to ensure that there was no one in the bedroom who could endanger the agents effecting the arrest. Once they entered the bedroom, they observed a waterbed with several drawers underneath it, one of which was partially open and contained men's clothing and currency.

Defendants argue that the agents must have opened the drawers themselves. Detective Fitzgibbon testified that the drawer in question was "partially ajar" (Tr. 2 at 44–46) whereas Agent Cid testified that the drawer was "pulled open fairly wide" (Tr. 1 at 13). This slight discrepancy is not significant.

Defendants maintain that Exhibit 2, the photograph of the currency in the drawer, shows that the drawer has been completely opened. Defendants argue that this was corroborated by the testimony of Yvonne Quarles and Defendant Leonard, both of whom testified that after being seated in the living room and before the warrant was obtained, they heard drawers in the bedroom being opened and closed (Tr. 3 at 56–57; Tr. 4 at 8).

Exhibit 2 is inconclusive as to the position of the drawer. Furthermore, Quarles and Leonard were seated in the living room where they could not view what was transpiring in the bedroom. In conducting a protective sweep, the agents were examining closets or objects large enough to conceal a person who may be a threat to the agents. These legitimate activities could have generated the sound of opening of drawers and/or doors.

To the extent that Yvonne Quarles and Derrick Leonard testified in a manner that was inconsistent with the law enforcement agents, their testimony must be disregarded. Defendant Leonard had a direct interest in the outcome of the case. Quarles, a friend of Defendant Fuller, also had an interest in the

outcome of the case. Furthermore, it was established that she misrepresented her criminal record when she previously testified at the detention hearing. Her testimony was at times evasive and non-responsive.

In summary, there is no reason not to credit the testimony of both Agent Cid and Detective Fitzgibbon on the location of the drawer and the currency.

3. *The Glassine Envelopes Containing Heroin*

■ Paragraph 8 of the Moskal affidavit states as follows:

Thereafter, the agents allowed Jackie Fuller to get dressed. At approximately 7:17 a.m., after Ms. Fuller was dressed, she picked up her purse, and upon picking up her purse, F.B.I. S.A. Wendy Horth observed that underneath where the purse had been were ten glassine tightly folded rectangular envelopes all held together with a large rubber band. Thereafter, S.A. Horth was able to look into the envelopes and observe that they contained a dark substance that appeared to be sticky. Thereafter, S.A. Cid observed the same materials, and based on his experience concluded that the dark substance was heroin.

The testimony from the Government agents on this issue contains some inconsistencies. Special Agent Horth testified that she saw the drugs next to the purse after she removed the purse from a closet door handle and placed it on the floor (Tr. 3 at 14–15). Detective Fitzgibbon, on the other hand, testified that Special Agent Horth moved the purse from the floor and then observed the glassine envelopes (Tr. 2 at 49–51). It is undisputed that the discovery of the drugs came 26 minutes after the officers entered the apartment.

Defendants argue that the conflicting testimony as to the location of the purse and the fact that the drugs were unobserved for such a lengthy period of time makes the Government's observations suspicious. Defendant also argues that Special Agent Horth likely looked into the purse for identification prior

to moving it, suggesting an unauthorized search of the purse.

Having listened to the testimony of the witnesses, I find that a discrepancy in testimony between Detective Fitzgibbon and Special Agent Horth is present but is not fatal to the Government's position. Both witnesses testified that the discovery of the drugs was inadvertent and that the drugs were in plain view. I find the agents testimony to be credible and worthy of belief.

### CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

Respectfully submitted,

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 30(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson–Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek, et al. v. Canadair Ltd., et al.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 30(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be sup-ported by legal authority." *Failure to comply with the provisions of Rule 30(a)(3), or with the similar provisions of Rule 30(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.*

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Government and the Defendants.

**SO ORDERED.**

**DATED: Buffalo, New York**
      **June 28, 1993**

