51 F.3d 269
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Shawn Lamont PETTIFORD, Defendant-Appellant.
 No. 94-5391.
 United States Court of Appeals, Fourth Circuit.
 Argued: March 9, 1995.
Decided: April 7, 1995.
 
 ARGUED: Reginald Moore Barley, Richmond, VA, for Appellant. Nicholas Stephan Altimari, Assistant United States Attorney, Richmond, VA, for Appellee. ON BRIEF: Helen F. Fahey, United States Attorney, Richmond, VA, for Appellee.
 Before RUSSELL, WILKINSON, and WILLIAMS, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 In this case we must determine whether law enforcement officers exceeded the scope of the "protective sweep" authorized by Maryland v. Buie, 494 U.S. 325 (1990), when, following an in-home arrest, they conducted a cursory search of the arrestee's bedroom closet for concealed assailants. Because we agree with the district court that the Sweep was authorized by Buie, we affirm.
 
 I.
 
 2
 On December 17, 1993, at approximately 5:30 a.m., officers of the Henrico County Police Department SWAT Team arrived at 307-D Imperial Drive, Henrico County, Virginia, to execute an arrest warrant for Carl Anthony Smith. A Drug Enforcement Administration Task Force officer had received information from a confidential informant that Smith was living in the Henrico County apartment. An investigation verified that information: Richmond, Virginia law enforcement files revealed several outstanding warrants for Smith charging him with, inter alia, possession of cocaine with intent to distribute, possession of a firearm while in possession of cocaine, possession of a sawed-off shotgun, and possession of a firearm by a convicted felon. The independent investigation also confirmed the description of Smith offered by the informant.
 
 
 3
 Based on this information, a Task Force officer obtained a warrant for Smith's arrest on the outstanding weapons and narcotics charges; the warrant provided leave for an exigent entry. Because the Task Force was aware of Smith's history of involvement with firearms, because Smith was a suspect in a homicide in another jurisdiction, and because the Task Force officers had information that individuals often answered the door at apartment 307-D while carrying firearms, the warrant was turned over to the Henrico County Police SWAT Team for execution.
 
 
 4
 The Task Force began surveillance of the apartment in the early morning hours of the 17th. Officers conducting the surveillance observed a high volume of traffic in and out of the apartment during the ensuing hours. Shortly before the SWAT Team entered 307-D, Task Force officers noticed the lights in the apartment go out. Despite the surveillance, however, the SWAT Team officers were unsure of the number of people they would find therein. Moreover, the Task Force had cautioned the SWAT Team that a woman and children might be present inside the apartment.
 
 
 5
 At approximately 5:30 a.m., ten SWAT Team officers entered the apartment pursuant to the warrant. According to a prearranged plan, the officers fanned out through the apartment in search of Smith. The plan further provided for a thorough "sweep" of the apartment to ensure that no other individuals inside the apartment posed a threat to the officers. The SWAT Team discovered Smith in one of the apartment's two bedrooms; appellant Shawn Lamont Pettiford was located in the other. At the time, the officers did not know which of the men was Smith. According to procedure, both men were handcuffed; Smith was placed on the floor of his bedroom while Pettiford was brought into the living room and seated in a chair.
 
 
 6
 During and immediately following the handcuffing of Smith and Pettiford, the SWAT Team executed the "sweep" of the apartment, during which officers assigned to various areas of the apartment examined closets, cabinets, and other spaces in which a potential assailant could conceal himself. The officers also conducted a search for weapons within the "grab area" of each defendant as permitted by Chimel v. California, 395 U.S. 752, 763 (1969) (allowing a search of the area within an arrestee's immediate control "from within which he might gain possession of a weapon or destructible evidence").
 
 
 7
 During the protective sweep, Officer J.R. Tucker III looked under the bed and into the closet in the bedroom in which Smith was apprehended. Upon looking into Smith's bedroom closet, Officer Tucker observed a waist-high pile of clothing "drifted" up to the back wall of the closet. As Tucker pushed the clothes aside, a large plastic bag secreted within the pile "fell out, and it came to rest in such a condition as [he] could look into it." When he peered into the bag, Tucker observed "three bundles of clear plastic wrapped around what appeared to be numerous other clear plastic packages containing some kind of rocky, chunky substance." Tucker testified that he moved the bag no further before bringing his discovery to the attention of his supervisor, then-Sergeant Christopher S. Alberta. Sergeant Alberta advised Tucker to leave the bag alone and continue with his sweep. During the sweep and "grab area" searches, the SWAT Team officers discovered large amounts of cash, a beeper, a Rolex watch, and a razor blade in plain view on Smith's bedside dresser; Pettiford directed the officers to a Tec-9 semiautomatic pistol and loaded magazine hidden under his bed.
 
 
 8
 Based on the evidence discovered during the initial sweep of the apartment, including the bag of cocaine found in the bedroom closet, Task Force agents sought and obtained a search warrant authorizing a search of the premises for controlled substances, money, weapons, records, and any other items used in or derived from the illicit sale and distribution of cocaine. This search warrant was executed shortly after 7:30 a.m. on the morning of the 17th. During this second and more extensive search, officers examined the gray plastic bag from Smith's closet and found that it contained in excess of five pounds of crack cocaine. The search also revealed, among other things, additional large quantities of crack cocaine, various papers belonging to both Pettiford and Smith, photographs of women smoking what appeared to be crack cocaine, and a set of electronic scales.
 
 
 9
 On January 4, 1994, a federal grand jury indicted Pettiford and Smith for possession with intent to distribute in excess of fifty grams of crack cocaine in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2; the indictment also charged Pettiford with carrying a firearm in relationship to the commission of a felony in violation of 18 U.S.C. Sec. 924(c)(1) and Sec. 2. On February 25, 1994, Pettiford filed a motion to suppress evidence obtained during the December 17, 1993, search, including the bag of cocaine found in Smith's closet. Following a suppression hearing, at which several Task Force and SWAT Team agents testified as to the events of December 17th, the district court denied Pettiford's motion. Pettiford thereafter entered a guilty plea to possession of more than five grams of cocaine and possession of a firearm while in commission of a felony, reserving his right to appeal the district court's denial of his suppression motion. See Fed. R.Crim.
 
 
 10
 P. 11(a)(2). The district court sentenced Pettiford to 120 months imprisonment. Pettiford appeals.
 
 II.
 
 11
 Pettiford insists that, insofar as officers "rummaged" through the clothes piled in Smith's bedroom closet, the search conducted by the SWAT Team ran afoul of the Fourth Amendment. The district court concluded to the contrary that Officer Tucker's exploration of Smith's bedroom closet, which led to discovery of the large bag of cocaine, was part of a proper "protective sweep" as authorized by Maryland v. Buie, 494 U.S. 325 (1990). We agree with the district court.
 
 A.
 
 12
 The scope of the protective sweep sanctioned by Buie is informed by its justification: the need to protect law enforcement officers from attacks by concealed assailants during an in-home arrest. Like the searches authorized by Terry v. Ohio, 392 U.S. 1 (1968), and Michigan v. Long, 463 U.S. 1032 (1983), a Buie sweep is a limited intrusion on privacy permissible on less than probable cause when circumstances warrant special precautions for the protection of law enforcement officers faced with potentially dangerous situations. Indeed, the Buie Court recognized the heightened danger of attacks launched from areas immediately surrounding the arrest scene and accordingly permitted, "as a precautionary matter and without probable cause or reasonable suspicion, [a brief search of] closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Buie, 494 U.S. at 334.
 
 
 13
 That is not to say, however, that Buie condones a top-to-bottom search of a private residence simply because law enforcement officers have carried out a valid custodial arrest on the premises. To the contrary, the facts of Buie itself reveal that a protective sweep "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Id. at 327. See also United States v. Hernandez, 941 F.2d 133, 137 (2d Cir.1991) (construing Buie, Terry, and Long together to sanction a limited protective search for weapons within the "grab area" of individuals, other than the arrestee, whom the police reasonably believe pose a danger to those on the arrest scene).
 
 
 14
 As the district court noted, the SWAT Team was asked to serve the arrest warrant on Smith precisely because Task Force agents had information that Smith had a history of violence and involvement with firearms. Despite the surveillance conducted by the Task Force agents, the SWAT Team entered the darkened apartment unsure of the number of people they would find within. Officer Tucker opened the closet door only to be confronted with a mountain of clothing. In these circumstances, we cannot say that Tucker exceeded the bounds of Buie when he poked through the clothes piled on the floor of Smith's closet to assure himself that no one was hiding beneath the clothing. To the contrary, Tucker's actions appear to be precisely what Buie envisioned: a brief inspection of areas from which potential assailants could launch an attack in order to ensure the safety of the SWAT Team officers. Indeed, the officer in charge of the SWAT Team operation testified at the suppression hearing that a brief search of the closet was virtually mandated by police procedures designed to ensure the officers' safety: "I would be all over my officer if he didn't search that closet."
 
 
 15
 The district court made a factual finding, upon reviewing the suppression hearing testimony and evidence (including photographs of Smith's bedroom closet), that even a large assailant could have readily concealed himself in the pile of clothing in order to launch an unexpected attack. Moreover, the district court concluded that the officers discovered the large gray bag of cocaine in the course of a proper Buie search for concealed assailants. On these facts, the district court did not clearly err in refusing to suppress evidence derived from a lawful Buie sweep.
 
 B.
 
 16
 Even apart from the constitutionality of the cursory sweep of Smith's bedroom closet under Buie, the inevitable discovery doctrine forecloses Pettiford's claim. Nix v. Williams, 467 U.S. 431 (1984), authorized the admission at trial of incriminating evidence discovered as a consequence of a constitutional violation if that evidence would ultimately or inevitably have been discovered absent the constitu tional violation. Because the cocaine in Smith's closet would have been discovered even if the SWAT Team officers had elected not to explore Smith's bedroom closet at the time of his arrest, evidence of the cocaine was properly admissible against Pettiford.
 
 
 17
 During the protective sweep of the apartment and the Chimel searches of the "grab areas" within the reach of Smith and Pettiford, the SWAT Team discovered ample evidence to establish probable cause for a search warrant. Indeed, the apartment was bedecked with drug paraphernalia cluttering virtually every available surface. In Smith's bedroom, the officers discovered an electronic pager, a razor blade, a Rolex watch, and large sums of cash in plain view on Smith's dresser; in the bedroom occupied by Pettiford, officers recovered a Tec-9 semiautomatic pistol and loaded magazine from beneath his bed and a loaded .380 magazine on his bedside dresser. Guns, electronic pagers and beepers, razor blades, and large sums of cash are recognized "tools of the trade" in the illegal drug trafficking industry. See generally United States v. Gastiaburo, 16 F.3d 582, 588 (4th Cir.), cert. denied, 115 S.Ct. 102 (1994) (upholding admission of expert testimony that beepers and address books are commonly used by drug traffickers); see also United States v. Barth, 990 F.2d 422, 425 (8th Cir.1993) (noting that pagers are tools of the drug trade); United States v. White, 875 F.2d 427, 433 (4th Cir.1989) (recognizing that firearms have become "tools of the trade" in illegal drug trafficking).
 
 
 18
 Under the standard set by Illinois v. Gates, 462 U.S. 213, 238 (1983), the officers clearly could have established a "fair probability that contraband or evidence of a crime [would] be found" in the apartment and thus secured a search warrant based on this evidence alone. A search pursuant to such a warrant ultimately would have yielded the contraband in the pile of clothes in Smith's closet. Under Nix, then, it is clear that the evidence obtained from Smith's closet, as well as the contraband and other evidence revealed by the subsequent search, would have been admissible against Pettiford in any event.
 
 III.
 
 19
 For the foregoing reasons, the judgment of the district court is
 
 
 20
 AFFIRMED..