**UNITED STATES of America, Appellee,**

v.

**Clarence Davis BLUE, also known as John Blue, Defendant–Appellant.**

No. 1015, Docket 95–1418.

United States Court of Appeals, Second Circuit.

Argued Dec. 21, 1995.

Decided March 5, 1996.

57

Douglas F. Eaton, New York City, for defendant-appellant.

Margery B. Feinzig, Assistant United States Attorney for the Southern District of New York, New York City (Mary Jo White, United States Attorney, Ira M. Feinberg, Assistant United States Attorney, on the brief), for appellee.

Before: MESKILL, ALTIMARI and CALABRESI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant Clarence Davis Blue appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York (Koeltl, J.), following his conditional plea of guilty to possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g). On appeal, Blue challenges his conviction, contending that the district court erred in denying his motion to suppress evidence seized in violation of the Fourth Amendment. Blue claims principally that the officers recovered a firearm in his apartment during an impermissibly broad protective sweep that extended to the area between his mattress and box spring. For the reasons set forth below, we vacate the judgment and remand for further proceedings in connection with Blue's suppression motion.

## BACKGROUND

This case arises out of the November 22, 1994 search of the interior of a bed in Blue's apartment incident to the arrest of another man, Elton Ogarro, in the course of an investigation by officers of the United States Drug Enforcement Administration ("DEA") Task Force into drug trafficking. The following description is drawn largely from the testimony of the officers at a hearing on Blue's motion to suppress the contents found within the interior of his bed.

On November 22, 1994, approximately a dozen agents and officers of the DEA's Task Force went to 64 East 131st Street in Manhattan to execute two arrest warrants and a search warrant for an apartment on the second floor. The arrest warrants were for Gregory Brown and Ogarro, who were believed to have been selling crack cocaine.

Shortly after the agents arrived in the vicinity, they arrested Brown outside the building. They waited a few minutes to see if Ogarro would also exit the building, and when he did not, the agents entered the building and walked up the stairs. Detective Joseph McHugh, the affiant on the warrants, discovered that the apartment specified in the search warrant did not have the padlock described by the informants; instead there was a padlocked apartment on the third floor. McHugh left the building to call the United States Attorney's Office and see if it was necessary to amend the search warrant. After the detective left, DEA Agents Donald Bullard, Mauricio Fernandez and Robert Koval, with the rest of the team behind them, proceeded up the staircase from the second floor to the third floor and stood at the head of the stairs, watching the padlocked apartment. Moments later, the agents saw Ogarro running down the hallway. Agent Fernandez grabbed Ogarro at the top of the stairs and attempted to push him up against the wall. The wall, however, turned out to be the door to Blue's apartment, which flew open, causing Ogarro to fall to the ground inside the apartment.

Agents Fernandez, Koval and Jenkins entered Blue's apartment, while Agent Bullard checked the other areas of the building. Jenkins identified Ogarro as the man for whom they had a warrant and handcuffed Ogarro behind his back, placing him on the floor face down. Jenkins then approached Blue, who had been sitting on the bed during the incident. Jenkins identified himself as a police officer, but received no response from Blue, who appeared lethargic, as though under the influence of a narcotic. Jenkins handcuffed Blue behind his back and placed him in a prone position on the floor. There was a distance of approximately two feet between Ogarro and the bed, and Jenkins placed Blue so that Blue was lying between the bed and Ogarro.

After Ogarro and Blue were handcuffed, Agents Jenkins and Koval performed a "security sweep" of the apartment; the apartment consisted of a single room, measuring approximately 12 feet by 8 feet, all of which was visible at a glance. Meanwhile, Agent Fernandez, who weighed over two hundred pounds, guarded the two men. Agent Koval lifted Blue's mattress off its box spring. In the middle of the box spring, Koval discovered a package wrapped in brown paper, a machine gun, and an ammunition clip.

Blue was arrested and charged in a criminal complaint with possessing a firearm in violation of 18 U.S.C. § 922(o). Further investigation revealed that Blue's criminal record included eight felonies. Blue was then indicted for possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g). On March 1, 1995, Blue moved to suppress the weapon and ammunition on the ground that the search of his apartment violated his Fourth Amendment rights. Following a suppression hearing on March 17, 1995, the district court denied the motion, holding that the agents' warrantless entry into Blue's apartment was justified by exigent circumstances, and that the search performed by the agents was a proper protective sweep incident to Ogarro's arrest. The district court concluded that the interior of Blue's bed was lawfully subject to a search because it was within the immediate reach of Ogarro, and, alternatively, the space between the box spring and the mattress lying directly on top of it could have concealed a person. The

district court also concluded that the seizure of the machine gun could be justified independently as the result of a limited protective search incident to the temporary detention of Blue.

Blue subsequently pled guilty pursuant to a conditional plea agreement, reserving the right to appeal the denial of his suppression motion. On July 11, 1995, the district court sentenced Blue principally to a 37–month term of imprisonment.

Blue now appeals solely to challenge the suppression ruling on his claim that the protective sweep was not properly limited.

## DISCUSSION

■ In examining a ruling on a motion to suppress, we review the district court's factual findings for clear error, and the district court's conclusions of law de novo. See United States v. Bold, 19 F.3d 99, 102 (2d Cir. 1994).

■ The Fourth Amendment prohibits only unreasonable searches and seizures. See Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 619, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989). In determining the reasonableness of the search, a court balances the intrusion on an individual's Fourth Amendment interests against the legitimate government interest in conducting the search under the circumstances. See Maryland v. Buie, 494 U.S. 325, 331, 110 S.Ct. 1093, 1096, 108 L.Ed.2d 276 (1990). In Buie, the Supreme Court determined that the Fourth Amendment permits law enforcement officers to conduct a limited protective sweep of a residence incident to an arrest to insure their own safety and the safety of others. 494 U.S. at 334, 110 S.Ct. at 1098. The Court held that an officer effecting an arrest in a residence may, "without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. Beyond that circumscribed inspection of the premises, however, the officer must reasonably believe, based on specific and articulable facts, that the area to be swept harbors a person posing a danger to those present before making the

warrantless search. Id. Moreover, as this Court has clarified, if an officer reasonably concludes that an individual poses a danger to those at the scene of the arrest, the threat of physical harm may be neutralized by a quick search for weapons within the reach of that individual. See United States v. Hernandez, 941 F.2d 133, 137 (2d Cir.1991).

It is clear in the instant case, that specific and articulable facts existed to indicate that Blue posed a danger; indeed, Blue himself concedes that the officers (1) had the requisite articulable facts to conclude that Blue posed a danger and (2) properly detained him. Blue's challenge on appeal, however, rests on his claim that the search between his mattress and box spring during his detention exceeded the permissible scope of a protective sweep. In considering Blue's appeal, we address separately the district court's conclusions that the search was legally justified because (1) the bed was within the immediate reach of Ogarro, and (2) the space between the mattress and box spring may have concealed a person.

### 1. Search of Area Within Immediate Reach or Control

In concluding that the officer's actions were part of a proper protective sweep, the district court cited this Court's decision in United States v. Hernandez, 941 F.2d 133 (2d Cir.1991), stating that "[t]he search in this case was limited to those areas within the immediate reach of Ogarro." Despite the district court's conclusion, the circumstances in the case at hand differ decidedly from Hernandez, and dictate a different outcome.

In Hernandez, we held that a protective sweep may encompass a search for weapons within the immediate "grab area" of a suspect who poses a threat to the safety of law enforcement officers. 941 F.2d at 137. In that case a team of deputy marshals, executing a warrant for Hernandez, staked out his apartment, and observed him and two other men enter Hernandez's apartment. After knocking on the apartment door, identifying themselves as police and receiving no response, the marshals broke through the door, arrested Hernandez and conducted a protec-

tive sweep of the apartment. In one of the rooms, a marshal discovered a woman, Betty Barrow, on a bed. The marshal handcuffed her and placed her on the floor. Because he was planning to place Barrow back on the bed, the marshal ran his hand along the edge of the bed between the mattress and the box spring, where he found a firearm. We concluded that "[i]f Barrow were left unattended even for a short period of time," it would have been possible for her to reach the searched area. *Id.* (internal quotation omitted). Accordingly, we held the search of the immediate area was reasonable in order to assess "whether there were weapons within Barrow's reach." *Id.*

As we did in *Hernandez,* in determining whether or not an area is within the arrestee's " 'immediate control,' " *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969) ("construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence"), we consider not only the arrestee's location, but also the nature of any restraints that have been imposed upon the person, *see, e.g., United States v. Berenguer,* 562 F.2d 206, 210 (2d Cir.1977) (where defendant and companion were shackled to each other on a bed, billfold on bureau in defendant's apartment was "clearly out of his reach or immediate control"). The officer in *Hernandez* based his need to conduct a cursory inspection of the area within the detainee's immediate control on several articulable factors: (1) the officer was planning to place Barrow directly on the bed after searching it; (2) from her position on top of the mattress, Barrow would have been able to reach the area directly under the outer rim of the mattress if she were left unattended; and (3) because the multi-room apartment contained at least three suspects in addition to Barrow, there was a real possibility that she might be left unattended. *See* 941 F.2d at 135–37.

In contrast, the circumstances in the present case make clear that the interior of Blue's bed was neither within Ogarro's nor Blue's immediate control. As an initial matter, the agents were not planning to place Ogarro or Blue on the bed. Ogarro and Blue were prone on the floor, two feet from the

bed, their hands cuffed behind their backs, and guarded by Agent Fernandez who stood over them. Ogarro's and Blue's manacled hands were clearly visible, at all times, to Agent Fernandez. Moreover, the suspects were guarded by additional officers; Agent Bullard was in the doorway, and Agents Koval and Jenkins were in the vicinity conducting the alleged security sweep of the one-room apartment. Given the small size of the one-room apartment and the fact that Ogarro and Blue were secured during the entire time in question, there was no possibility that either one of them could reach deep into the interior of the bed without being stopped by Agent Fernandez or one of the other agents.

The legitimate protective search in *Hernandez* differed in another significant respect from the one conducted here. In *Hernandez,* the search consisted solely of the officer running his hand along the very edge of the area between the mattress and box spring— the potential grab area of the detainee. By contrast, in this case, Agent Koval lifted the mattress off its box spring to search the area deep within the bed. Clearly, under the combination of circumstances present in this case, such a search extended beyond the area from within which Blue or Ogarro might have gained possession of a weapon. Accordingly, because the protective sweep was overbroad, the district court erred in declining to suppress the firearm on this ground.

### 2. Search of Area Harboring an Individual

In the alternative, the district court held that the search of the interior of the bed was justified as a protective sweep for a possible third person. Because we conclude that the officers failed to articulate specific reasons for their suspicion that the bed harbored a dangerous person, the search under the mattress cannot be justified as a protective sweep.

The Supreme Court has emphasized that a proper protective sweep in conjunction with an in-home arrest extends only to "a cursory inspection of those spaces where a person may be found." *Buie,* 494 U.S. at 335, 110 S.Ct. at 1099. Therefore, even

where an arresting officer is justified in conducting a sweep for unseen third parties in a residence, the officer is not entitled to conduct a full search of the premises. *See id.* at 336, 110 S.Ct. at 1099 ("[t]he type of search we authorize today is far removed from [a] 'top-to-bottom' search"). Rather, such a search may only encompass those spaces where an individual might be found. *See id.* at 335–36, 110 S.Ct. at 1099.

 Without taking issue with the credibility of the officers or the district court's determination that their testimony was credible, we conclude that the law enforcement officers did not "articul[ate] facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334, 110 S.Ct. at 1098. When the agents entered into Blue's apartment unannounced, this space was compressed by Blue, who was sitting on top of the bed. While the government suggests there could have been a person hiding in a cavity in the box spring, the officers lacked articulable facts at the time of the sweep to support such an inference. There was no indication in the record of any movement by Blue or any other unidentified individuals when the agents entered the room. Moreover, there was no indication that the officer's search was the result of a rise or bulge in the mattress, nor did the officers suggest anything unusual about the bed. Furthermore, the arresting officers had no information concerning Blue or his apartment prior to their unanticipated entry which would indicate that their safety was threatened by a hidden confederate, let alone one within the confines of the mattress and box spring. To the contrary, the officers' testimony established several facts that made it less likely that there was a person in between the mattress and box spring: (1) Blue offered no resistance to his detention, (2) the agents already had secured the two men for whom the arrest warrants were issued, (3) the surprise entry into the apartment precluded the possibility that someone hid in the bed in anticipation of entry by the police, and (4) a cursory inspection of the single-room

apartment failed to reveal signs of any person except Blue.

Accordingly, because the nature and scope of the intrusion cannot be justified by a reasonable, articulable suspicion that the mattress concealed a dangerous person, the denial of the suppression motion cannot be sustained on this ground.

## CONCLUSION

For the foregoing reasons, we vacate the judgment of conviction and remand the matter to the district court for further proceedings consistent with this opinion.