**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 95-5146

NATHANIEL DAWSON, SR.,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.
                                                           No. 95-5152
NATHANIEL DAWSON, JR., a/k/a Jack
Steele,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.
                                                           No. 95-5187
SEAN KIRKLAND, a/k/a Shawn Kemp,
a/k/a Seth Webb,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 95-5342

BEVERLY LUCINDA BROWN,
Defendant-Appellant.

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge.
(CR-94-10-WN)

Argued: January 31, 1997

Decided: April 21, 1998

Before RUSSELL* and WILKINS, Circuit Judges, and HERLONG,
United States District Judge for the District of South Carolina,
sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Wesley Marc Serra, BROWN, BERNE & SERRA, New
York, New York, for Appellant Dawson, Jr.; Flynn M. Owens, HOW-
ARD CARDIN, P.A., Baltimore, Maryland, for Appellant Dawson,
Sr.; Michael J. Moran, Baltimore, Maryland, for Appellant Kirkland;
Joseph Murtha, IRWIN, GREEN & DEXTER, L.L.P., Baltimore,
Maryland, for Appellant Brown. Christine Manuelian, Assistant
United States Attorney, Katharine Jacobs Armentrout, Assistant
United States Attorney, Baltimore, Maryland, for Appellee. **ON
BRIEF:** Howard L. Cardin, CARDIN & GITOMER, P.A., Baltimore,
Maryland, for Appellant Dawson, Sr.; David B. Irwin, IRWIN,
KERR, GREEN, MCDONALD & DEXTER, Baltimore, Maryland,
for Appellant Brown. Lynne A. Battaglia, United States Attorney,
Baltimore, Maryland, for Appellee.

_____

*Judge Russell heard oral argument in this case but died prior to the
time the decision was filed. The decision is filed by a quorum of the
panel. See 28 U.S.C.A. § 46(d) (West 1993).

2

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Nathaniel Dawson, Jr. (Dawson), Nathaniel Dawson, Sr. (Dawson, Sr.), Sean Kirkland,[1] and Beverly Brown (collectively, "Appellants") appeal their convictions on various charges arising from their participation in a narcotics distribution conspiracy in Baltimore, Maryland. Additionally, Brown appeals the sentence imposed on her by the district court. Finding no error, we affirm.

I.

Beginning in 1991, Dawson was the leader of an organization that distributed cocaine in a neighborhood in Baltimore. Kirkland served as Dawson's chief lieutenant. Brown, Dawson's girlfriend, assisted Dawson in delivering cocaine and firearms to various stash houses near locations where the drugs were sold. Although Kirkland was primarily responsible for overseeing the sellers, Dawson occasionally visited the operation accompanied by his bodyguards, who were armed with firearms provided by Dawson. At the end of each day, Dawson and Kirkland would collect the proceeds and tally the profits at a house Kirkland shared with his girlfriend, Mary Personeus.

On November 4, 1993, Dawson and two bodyguards, Eric Drayton and Kendrick McCray, were observing the sellers when an automobile drove down the street toward them. At Dawson's direction, McCray approached the vehicle and spoke to the occupants, who ignored him and stopped in front of Dawson and Drayton. Words

_____

[1] Kirkland was identified in the indictment as "Seth Webb," an individual with an alias of "Shawn Kirkland." The judgment of conviction and the Government's brief, however, identify Kirkland as "Sean Kirkland," an individual with an alias of "Seth Webb." We will refer to this individual as "Kirkland" throughout this opinion.

were exchanged and Dawson drew his firearm, prompting Drayton and McCray to do likewise. Drayton and McCray then began firing their weapons, intending to kill the occupants of the vehicle. During the shootout, a stray bullet struck and killed Tauris Johnson, a ten-year-old boy who had been playing football nearby.

The following day, Dawson, Drayton, McCray, and others fled to New York. After obtaining an arrest warrant for Dawson in connection with the murder of Tauris Johnson, Baltimore law enforcement officers requested assistance from a task force in New York composed of federal and state agents. In response to this request, New York City Police Detective Austin Fields, after learning that Dawson was on active parole in New York, obtained an address and phone number for him. Fields telephoned Dawson and, posing as Dawson's new parole officer, informed Dawson that he would be by to see him that afternoon. Fields arrived at Dawson's apartment and gained admission to the premises. After verifying Dawson's identity, Fields arrested him, placed him in handcuffs, and seated him near the front door. Hearing a radio playing in a back room and aware that Dawson was believed to have traveled to New York with others suspected of criminal activity, accompanying officers conducted a protective sweep to determine if any other persons were present. During the sweep, Detective Billy Ralat observed in plain view in one of the bedrooms a triple-beam scale, a lock box, and an empty box of the type used to store firearms. In stooping to look under the bed, Detective Ralat further observed that the mattress was askew on the box spring. Recalling training videos in which suspects had cut holes in box springs and had hidden inside to avoid apprehension, Detective Ralat lifted the mattress and discovered several firearms. These weapons were later seized pursuant to a search warrant; two of them were determined to be weapons employed in the Tauris Johnson shooting.

Dawson was returned to Baltimore in mid-December, indicted on state charges, and incarcerated pending trial. Shortly thereafter, Dawson contacted former bodyguard Gregory Lyons and asked him to "take care of the witnesses" against Dawson. J.A. 701-02 (internal quotation marks omitted). After Lyons declined the request, Dawson, Sr. contacted Kirkland. Dawson, Sr. showed Kirkland the indictment and stated that he was going to kill all of the witnesses against Dawson. A few days later, Kirkland identified witness Latisha Murphy to

4

Dawson, Sr., who approached Murphy and shot her twice in the head, killing her.

Subsequently, Appellants were tried and convicted of conspiracy to possess with the intent to distribute and to distribute cocaine. See 21 U.S.C.A. § 846 (West Supp. 1997). Dawson and Kirkland were convicted of the intentional killing of another while engaging in an offense punishable under 21 U.S.C.A. § 841(b)(1)(A) (West Supp. 1997) for the killing of Tauris Johnson. See 21 U.S.C.A. § 848(e)(1)(A) (West Supp. 1997). Dawson, Kirkland, and Dawson, Sr. were convicted of three counts in connection with the murder of Latisha Murphy: killing to prevent the attendance or testimony of a person in an official proceeding, see 18 U.S.C.A. § 1512(a)(1)(A) (West Supp. 1997); killing to prevent the communication of a person with law enforcement officials, see 18 U.S.C.A. § 1512(a)(1)(C) (West Supp. 1997); and conspiracy to kill a person in violation of 18 U.S.C.A. § 1512(a)(1)(A), (C), see 18 U.S.C.A. § 371 (West 1966). We address seriatim Appellants' challenges to their convictions and Brown's appeal of the sentence imposed by the district court.

II.

Appellants first maintain that the district court erred in denying a motion to suppress evidence found in Dawson's New York apartment. According to Appellants, the district court incorrectly concluded that law enforcement officers were justified in conducting a protective sweep of the apartment after arresting Dawson and placing him in handcuffs. Appellants argue alternatively that even if a protective sweep of the apartment in general was warranted, the justification for the sweep did not extend to the lifting of the mattress in the bedroom. We conclude that both of these contentions are without merit.

The Supreme Court has defined a protective sweep as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Maryland v. Buie, 494 U.S. 325, 327 (1990). "[A]s a precautionary matter and without probable cause or reasonable suspicion," arresting officers may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could

5

be immediately launched." Id. at 334. Any further protective sweep, however, requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. Whether a protective sweep was justified is a mixed question of law and fact; accordingly, we review the factual findings of the district court for clear error and its ultimate legal conclusion de novo. See United States v. Han, 74 F.3d 537, 540 & n.1 (4th Cir. 1996).

We have little difficulty in concluding that a protective sweep of the apartment in general was justified in this case. Prior to entering Dawson's apartment to effect his arrest, officers were aware that Dawson had traveled to New York with individuals suspected of being accomplices in the crime for which Dawson was to be arrested. Furthermore, there was a pause of some length between the time Detective Fields knocked on Dawson's door and the time Dawson responded. Finally, when officers entered the apartment they could hear a radio playing in a back room. Taken together, these facts are sufficient to support a reasonable suspicion that others might have been on the premises with Dawson, thereby justifying a protective sweep.

We also reject Appellants' challenge to the scope of the sweep. Relying primarily on United States v. Blue, 78 F.3d 56 (2d Cir. 1996), Appellants claim that even if a protective sweep of the apartment was justified, Detective Ralat did not possess a reasonable suspicion that someone might be hiding under the mattress. The Blue court held that a search under the mattress on which the defendant had been sitting when apprehended was not justified as a protective sweep because searching officers "failed to articulate specific reasons for their suspicion that the bed harbored a dangerous person." Id. at 60.

> When the agents entered into Blue's apartment unannounced, [the space underneath the mattress] was compressed by Blue, who was sitting on top of the bed. While the government suggests there could have been a person hiding in a cavity in the box spring, the officers lacked articulable facts at the time of the sweep to support such an inference. There was no indication in the record of any

6

movement by Blue or any other unidentified individuals when the agents entered the room. Moreover, there was no indication that the officer's search was the result of a rise or bulge in the mattress, nor did the officers suggest anything unusual about the bed. Furthermore, the arresting officers had no information concerning Blue or his apartment prior to their ... entry which would indicate that their safety was threatened by a hidden confederate, let alone one within the confines of the mattress and box spring.

Id. at 61. This reasoning plainly does not support the result Appellants seek in this case. Here, the officers were aware that Dawson was in New York with at least two confederates; furthermore, the delay in Dawson's response to the knock on his door and the sound of the radio in the back of the apartment could support an inference that others were in the apartment. Finally, Detective Ralat decided to lift the mattress only after observing that it was askew on the box spring, indicating that it might have been moved in haste. Under these circumstances we hold that the district court correctly determined that the lifting of the mattress fell within the scope of a proper security sweep.

III.

Appellants also argue that they were denied their constitutional right to a fair and impartial jury by prejudicial pretrial publicity concerning the case. In particular, Appellants point to an article published in a local newspaper on the day of jury selection. The article, titled "I think they're going to kill us one day," recounted Latisha Murphy's testimony before the grand jury, noting specifically Murphy's prescient concern that members of the conspiracy would"kill us one day when it's all over with." J.A. 142 (internal quotation marks omitted). Appellants do not contend that the jury was actually prejudiced as a result of exposure to this article; rather, they maintain that its content was so inflammatory that prejudice should be presumed.

Appellants are correct, of course, that in some cases "adverse pretrial publicity can create such a presumption of prejudice in a community that ... jurors' claims that they can be impartial should not be believed." Patton v. Yount, 467 U.S. 1025, 1031 (1984). This pre-

7

sumption, however, should be invoked "[o]nly in extreme circumstances." Wells v. Murray, 831 F.2d 468, 472 (4th Cir. 1987). In establishing a presumption of prejudice, Appellants bear the burden of showing that "media or other community reaction ... engender[ed] an atmosphere so hostile and pervasive as to preclude a rational trial process." Rock v. Zimmerman, 959 F.2d 1237, 1252 (3d Cir. 1992) (en banc); see Wells, 831 F.2d at 472. Appellants cannot satisfy this burden. While the newspaper article was undoubtedly inflammatory to some degree, the record does not support a conclusion that the effect of the article was so pervasive as to preclude the impanelling of an impartial jury. Of the 100-member venire, only 23 prospective jurors were familiar with the article, and only nine of those were affected by it to such a degree that the district court found it necessary to excuse them for cause. Accordingly, we reject Appellants' contention that they were entitled to a presumption of prejudice arising from pretrial publicity.

IV.

Dawson and Dawson, Sr. contend that the district court erred in admitting into evidence statements made by Kirkland to Personeus regarding the killings of Tauris Johnson and Latisha Murphy, arguing that the statements were not admissible under Federal Rule of Evidence 801(d)(2)(E). We disagree.

Rule 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. Such a statement is admissible only if the Government establishes by a preponderance of the evidence that a conspiracy existed involving the declarant and the person against whom the statement is offered and the statement was made during the course and in furtherance of the conspiracy. See Bourjaily v. United States, 483 U.S. 171, 175 (1987). Here, Dawson and Dawson, Sr. contend that the statements made by Kirkland to Personeus--which described the events surrounding the murders of Tauris Johnson and Latisha Murphy-- were not made in furtherance of the conspiracy. We review the decision of the district court to admit coconspirator statements for an abuse of discretion. See United States v. Blevins, 960 F.2d 1252, 1255 (4th Cir. 1992).

8

"A statement by a coconspirator is made in furtherance of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect." United States v. Shores, 33 F.3d 438, 443 (4th Cir. 1994) (internal quotation marks omitted). Furthermore, "[a] particular statement may be found to be in furtherance of the conspiracy even though it is susceptible of alternative interpretations and was not exclusively, or even primarily, made to further the conspiracy," provided there is a reasonable basis for concluding that the statement was made to further the conspiracy. Id. at 444 (internal quotation marks omitted). Although idle chatter or entirely retrospective statements generally are not considered to be in furtherance of the conspiracy, narratives of past events are admissible under Rule 801(d)(2)(E) if they serve some present purpose in the conspiracy, e.g., by promoting cohesiveness among, or providing reassurance to, the conspirators. See United States v. Thai, 29 F.3d 785, 813 (2d Cir. 1994). Retrospective statements are also in furtherance of the conspiracy if they serve to inform a conspirator of the status of the conspiracy. See United States v. Edmond, 52 F.3d 1080, 1111 (D.C. Cir. 1995) (per curiam).

In light of these principles, we conclude that the district court did not abuse its discretion in determining that the statements made by Kirkland to Personeus were made in furtherance of the conspiracy. The challenged statements, which related recent events in the life of the conspiracy, plainly served to update Personeus on the status of the criminal enterprise of which she was a part.[2] Accordingly, we reject Dawson and Dawson, Sr.'s challenge to the admission of these statements.

V.

Next, Dawson and Kirkland maintain that the evidence is insufficient to support their convictions for murdering Tauris Johnson in furtherance of the conspiracy. More specifically, Dawson and Kirkland

_____

[2] Dawson and Dawson, Sr. do not claim that Personeus was not a member of the conspiracy. Cf. Shores, 33 F.3d at 444 (explaining that in order to be in furtherance of a conspiracy, a statement to a nonconspirator must be made for the purpose of inducing that person to join the conspiracy or to assist the conspiracy in accomplishing its objectives).

9

argue that the evidence adduced at trial does not support a finding that they are responsible, either directly or indirectly, for the killing of Tauris Johnson. We disagree.

Dawson and Kirkland were convicted of violating 21 U.S.C.A. § 848(e)(1)(A), which applies, <u>inter alia</u>, to "any person engaging in an offense punishable under [21 U.S.C.A. § 841(b)(1)(A)] ... who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results." Dawson and Kirkland concede that at the time of Tauris Johnson's death they were engaged in an offense punishable under § 841(b)(1)(A) and that the boy was killed as a result of their actions, but dispute the sufficiency of the evidence supporting a conclusion that they either intentionally killed Tauris Johnson or counseled, commanded, induced, procured, or caused an intentional killing. In considering this argument, we must determine whether there is substantial evidence, viewed in the light most favorable to the Government, to support the verdict. <u>See Glasser v. United States</u>, 315 U.S. 60, 80 (1942).

It is undisputed that neither Dawson nor Kirkland fired the fatal bullet. Rather, the Government sought to convict the two on the basis that the intentional killing of Tauris Johnson[3] was reasonably foreseeable to them within the scope of their participation in the conspiracy. <u>See Pinkerton v. United States</u>, 328 U.S. 640, 646-48 (1946). After reviewing the record, we conclude that there is ample evidence from which a jury could deduce that the intentional killing of another was foreseeable to Dawson and Kirkland. As to Dawson, testimony at trial established that he recruited bodyguards to accompany him when he observed selling operations and that he provided firearms for their use. Moreover, it was Dawson who first pulled his weapon on

---

[3] There is no dispute that Drayton and McCray, one of whom fired the shot that killed the boy, did not intend to murder an innocent bystander. The record is clear, however, that Drayton and McCray intended to kill the occupants of the vehicle, making the killing of Tauris Johnson intentional under a theory of transferred intent. <u>See Maes v. Thomas</u>, 46 F.3d 979, 984 n.4 (10th Cir. 1995) (explaining that doctrine of transferred intent is applicable when an individual intends to kill one person, but instead kills a bystander).

10

November 4, prompting Drayton and McCray to do the same and eventually to fire on the occupants of the automobile. This evidence certainly is adequate to support a finding that a killing was reasonably foreseeable to Dawson. The evidence is no less compelling with respect to Kirkland. As Dawson's right hand in the conspiracy, Kirkland had personal knowledge that members of the conspiracy were armed and that the use of deadly force was a real possibility. Indeed, Kirkland himself carried a gun and on the day of the Tauris Johnson murder warned a rival drug dealer not to attempt to invade Dawson's turf, an act that "would start a war." J.A. 700. We conclude that this evidence was sufficient to support the convictions for the murder of Tauris Johnson.

VI.

Finally, Brown maintains that the district court erred in determining her sentence, arguing primarily that the court improperly applied a cross reference in the drug conspiracy guideline to the guideline for first degree murder based on the killing of Tauris Johnson. See U.S. Sentencing Guidelines Manual § 2D1.1(d)(1) (1994) (directing the court to apply the guideline for first degree murder "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States"). Brown contends that because the killing of Tauris Johnson was not reasonably foreseeable to her within the scope of her participation in the conspiracy, it cannot be employed as a basis for application of the cross reference. See U.S.S.G. § 1B1.3(a)(1)(B). After reviewing the record, we conclude that the district court did not commit clear error in determining that the killing of Tauris Johnson was reasonably foreseeable to Brown. See United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir. 1989).[4]

_____

**4** In light of our determination that the district court properly applied the cross reference, we need not address Brown's argument that the district court erred in its alternative calculation of the quantity of drugs attributable to Brown for sentencing purposes. And, we conclude that the remainder of Brown's challenges to her sentence are without merit.

11

VII.

In sum, we hold that all of Appellants' challenges to their convictions are without merit. And, we conclude that the district court correctly sentenced Brown. Accordingly, we affirm.

AFFIRMED

12