**UNITED STATES**

v.

**Thomas JULIUS.**

**No. 3:07–CR–248 (RNC).**

United States District Court,
D. Connecticut.

Aug. 7, 2008.

Anthony E. Kaplan, John H. Durham, Sarah P. Karwan, U.S. Attorney's Office, New Haven, CT, for Plaintiff.

Gary D. Weinberger, Federal Public Defender's Office, Hartford, CT, for Defendant.

### RULING AND ORDER

ROBERT N. CHATIGNY, District Judge.

The defendant is charged in a two count indictment with unlawful possession of a pistol and ammunition, which he has moved to suppress. The pistol was discovered as a result of a search conducted subsequent to the defendant's arrest in the apartment of a third party, Shana Moseley, with whom the defendant was staying after he absconded from state parole. After the pistol was discovered, a more extensive search of Ms. Moseley's apartment conducted pursuant to her written consent uncovered the ammunition. The motion to suppress has been the subject of an evidentiary hearing and briefing. In a prior oral ruling, the motion to suppress the ammunition was denied on the ground that Ms. Moseley's written consent was given voluntarily.[1] The matter is now before me for a ruling with regard to the validity of

---

1. Defendant contends on the basis of an affidavit provided by Ms. Moseley that she did not voluntarily consent to either the officers' initial entry into the apartment or to the search that uncovered the ammunition. Her affidavit is contradicted by the live testimony of the Government's witnesses at the suppression hearing, which I find more reliable than Ms. Moseley's affidavit.

the initial search in the apartment that resulted in the discovery of the pistol. The Government contends that this search was lawful either as a search incident to arrest under *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), or as a special needs parole search supported by reasonable suspicion. I conclude that the Government has not satisfied its burden of establishing the validity of the search under either theory and therefore grant the motion to suppress the pistol.

## I. *Facts*

On January 2, 2002, the defendant was sentenced in Connecticut Superior Court to four years in prison followed by four years of special parole for possession of narcotics with intent to sell. At the same time, he received a concurrent sentence of four years in prison followed by four years of special parole for a probation violation relating to a sex offense. On August 5, 2002, the defendant was sentenced to three years and six months in prison, concurrent with the balance of the term of imprisonment in the narcotics case, for possession of a pistol without a permit.

On September 5, 2006, the defendant completed his term of imprisonment and was placed on special parole under the jurisdiction of the Board of Pardons and Paroles ("the Board"), an executive agency located within the Connecticut Department of Correction. *See* Conn. Gen.Stat. § 54–124a. A person on special parole is "subject to such rules and conditions as may be established by the Board. . . ." Conn. Gen. Stat. § 125e(b). When a parolee is suspected of violating a parole condition, the

Board may hold a hearing; if a violation is established, the Board may commit the parolee to prison for all or part of the balance of the period of special parole. *See* Conn. Gen.Stat. § 125e (d)-(f).

The defendant's parole conditions required him to live with a sponsor in an approved residence, which his parole officer had a right to visit at any reasonable time. The defendant was required to meet with his parole officer once a week, attend weekly substance abuse counseling sessions, participate in sex offender treatment, maintain compliance with the provisions of the Connecticut Sex Offender Registry, and participate in a program of electronic monitoring. He was prohibited from possessing a firearm, ammunition, illegal drugs, narcotics or drug paraphernalia. The defendant's parole conditions were silent with regard to parole searches.[2]

On October 17, 2006, the defendant failed to attend his weekly substance abuse counseling session. He also failed to attend the following week. The defendant's parole officer, Jose Cartagena, contacted the defendant's sponsor and learned that the defendant had vacated his approved residence. Based on this information, Officer Cartagena received permission from his supervisor to remand the defendant into custody for violating the conditions of his special parole. Officer Cartagena subsequently spoke with the defendant by telephone a number of times but the defendant refused to disclose his location and failed to turn himself in. Accordingly, Officer Cartagena transferred

---

**2.** The Board of Pardons and Paroles recently adopted a standard parole condition permitting searches of a parolee's home without individualized suspicion. *See* Connecticut Board of Pardons and Paroles, Standard Conditions of Parole No. 13 (May 6, 2008), *available at* http://www.ct.gov/doc/pdf/parole conditions.pdf ("You shall be required to submit

to a search of your person, possessions, vehicle, business, residence or any area under your control at any time, announced or unannounced, with or without cause, by parole or its agent to verify your compliance with the conditions of your parole."). No such condition was in effect at the time of the search at issue here.

the defendant's case to the Board's fugitive investigation unit, and the Board issued a warrant for the defendant's reimprisonment.[3]

About two months later, on February 20, 2007, Officer Cartagena learned from a confidential source that the defendant was living with Ms. Moseley in the Fair Haven section of New Haven. Though the defendant's case had been transferred to the fugitive investigation unit, Officer Cartagena followed up on this tip himself. His investigation confirmed that the defendant was staying with Ms. Moseley at her apartment on the first floor of a multifamily house at 189 English Street. Officer Cartagena immediately notified the person in the fugitive investigation unit responsible for the defendant's case, Daniel Barry.

Officer Barry reviewed the defendant's record and decided that an attempt should be made to apprehend him the next day. He contacted Deputy United States Marshal Charles J. Wood and asked him to assist in apprehending the defendant. Deputy Wood testified that the Marshals Service works with Connecticut parole officers on a "frequent basis." Transcript of Suppression Hearing ("Tr.") 111.[4] Officer Barry also asked Officer Cartagena to come along in a "secondary role." Tr. 162.

The next morning, February 21, Officer Barry, Officer Cartagena and three other parole officers met before going to English Street. They were joined by Deputy Wood. Officer Cartagena gave the group information about the defendant's physical appearance and criminal record. The officers then drove to 189 English Street.

Officer Barry, Officer Cartagena and Deputy Wood went to the front door of the Moseley residence; the other officers took up positions at the side and rear of the house.

At about 10:00, the officers began to knock on Ms. Moseley's front door. No one answered. The officers continued to knock for several minutes and still got no response. A child who lived upstairs emerged from her residence and was shown a photograph of the defendant. The child confirmed that the defendant was inside the Moseley residence.

At about 10:10, the officers heard Ms. Moseley ask, "Who is it?" The officers replied, "Parole officers" and "Police." Ms. Moseley said she had to get dressed. A few minutes later, she opened the door. Officer Barry asked Ms. Moseley if she knew why they were there and she replied "No." Officer Barry showed her the photograph of the defendant, said they had a warrant for his arrest, and asked if he was inside. Speaking softly so as not to be overheard by the defendant, Ms. Moseley indicated that the defendant was in the rear of the apartment with her young son, asked the officers to be careful of her son, then moved to the side, permitting them to enter. Deputy Wood and Officer Barry entered with their guns drawn. Officer Cartagena stayed behind with Ms. Moseley.

Ms. Moseley's apartment contained a living room, kitchen, bathroom and two bedrooms. Deputy Wood and Officer Barry moved from the front door, through the living room to the kitchen. When Deputy

**3.** The warrant directed any proper officer to arrest the defendant and deliver him to the custody of the Department of Correction pending a parole revocation hearing. The Board may issue such a warrant based on a finding of probable cause that the parolee has violated a parole condition. *See* Conn. Gen. Stat. § 54–127; Conn. Agencies Regs. §§ 54–124a(J)(1)–1, 54–124a(J)(1)–4.

**4.** The record indicates that there is a memorandum of understanding between the Marshals Service and the Board pursuant to which Deputy U.S. Marshals help the Board apprehend fugitives when requested to do so.

Wood reached the kitchen, he looked through an open doorway to an adjoining bedroom and saw the defendant lying on a bed. Deputy Wood called to the defendant by name and ordered him not to move. The defendant complied with the order. Officer Barry, who overheard Deputy Wood speak to the defendant, conducted a quick security check of the other bedroom and bathroom, then joined Deputy Wood.

The bedroom containing the defendant was small, about ten feet by ten feet, and cramped. The only area for walking was restricted to a narrow perimeter around the sides and foot of the bed. The head of the bed was against a wall on the officers' right as they entered. The defendant was lying on the far side of the bed. His head was close to the foot of the bed and his arms were over his head. He was wearing jeans and a t-shirt. Ms. Moseley's two-year-old son was lying in a similar manner closer to the officers. Both the defendant and the child were awake.

The officers moved to the defendant's side of the bed to take him into custody. Officer Barry took control of the defendant's arms, ordered him to sit up, and removed him from the bed with assistance from Deputy Wood. The defendant was placed in handcuffs with his hands behind his back. Officer Barry took the lead in handcuffing the defendant; Deputy Wood assisted. The handcuffs were close-fitting and double-locked. The defendant remained compliant throughout and offered no resistance.

Once the defendant was securely handcuffed, Officer Barry began to escort the defendant from the bedroom to the kitchen. He yelled to Officer Cartagena that the defendant was in custody. Officer Cartagena notified the other officers, all of whom proceeded to enter the apartment.

As Officer Barry was escorting the defendant from the bedroom in handcuffs, Deputy Wood undertook to search the area in the vicinity of the bed to see if the defendant had discarded a weapon, narcotics or other contraband. Deputy Wood commenced the search by looking through some clothing and other items that were strewn on the floor along the side of the bed where the defendant was taken into custody. Nothing incriminating was found. Next, he lifted the mattress on the bed, which hung over the edge of the box spring by about a foot. Using both hands, he lifted the mattress eighteen inches or so, looked underneath, and saw a pistol. The handle of the pistol protruded slightly over the edge of the box spring. Deputy Wood yelled that he had found a gun, lowered the mattress and suspended the search.

Officer Barry was not sure what to do about the pistol. As he testified, "All we were there for was to find [the defendant] and take him into custody. We had done that. The weapon being found is out of our parameters or out of our scope of what we do." Tr. 178. After some discussion between Officer Barry and Deputy Wood, the New Haven Police Department was contacted and asked to come to the apartment to deal with the pistol.

Deputy Wood then asked Ms. Moseley for permission to search the apartment. Ms. Moseley told Deputy Wood that she wanted to speak with her mother first. Ms. Moseley contacted her mother by telephone. Her mother was concerned about the situation and went to the apartment to help. After further discussion, Ms. Moseley signed a form giving the officers consent to search the apartment. New Haven police officers subsequently conducted a search that included removing the mattress from the box spring in the bedroom where the defendant was arrested. When the mattress was removed, the officers discovered a magazine containing 24 .45 caliber rounds. This is the ammunition

that provides the basis for the charge in count two.

## II. *Discussion*

### A. *Search Incident to Arrest*

Under *Chimel,* the permissible scope of a search incident to an arrest in a dwelling is limited to the arrestee's person and the area within his "immediate control," which is defined as "the area from within which he might gain possession of a weapon or destructible evidence." 395 U.S. at 763, 89 S.Ct. 2034. When Deputy Wood lifted the mattress to see what might be underneath, the area under the mattress was not within the defendant's immediate control as defined in *Chimel.* Officer Barry and the defendant were near the doorway to the bedroom, about eight to ten feet away from Deputy Wood. The defendant, who is about 5'4", was under the control of Officer Barry, who is 6'7". Both Officer Barry and Deputy Wood were positioned between the defendant and the area under the mattress on the side of the bed where the pistol was found. To gain access to that area, therefore, the defendant would have had to break free from Officer Barry, push Officer Barry out of the way, move to the opposite side of the bed, kneel with his back to the bed, and reach behind his back into the area between the mattress and box spring, all without being stopped by Officer Barry or Deputy Wood. It is inconceivable that he could accomplish this while securely handcuffed behind his back.

In *United States v. Blue,* 78 F.3d 56 (2d Cir.1996), the defendant moved to suppress a machine gun discovered between a mattress and box spring after the defendant was removed from the mattress, handcuffed behind his back and placed face-down on the floor. The issue raised by the motion to suppress was whether the area between the mattress and box spring was within the defendant's "immediate control" as defined in *Chimel.* The Dis-

trict Court declined to suppress the machine gun relying on *United States v. Hernandez,* 941 F.2d 133 (2d Cir.1991), which upheld a search under the outer edge of a mattress because it was within the grab area of a handcuffed detainee. The Second Circuit concluded that *Hernandez* was not controlling because the officer who conducted the search in that case planned to put the handcuffed detainee back on the bed in a position where she could reach under the mattress if left unattended even for a brief time, which was a distinct possibility because the multi-room apartment contained three other suspects. In *Blue,* in contrast, the apartment consisted of a single room, the defendant and his confederate were guarded by an officer who stood over them at all times, and three more officers were in the immediate vicinity. "Given the small size of the one-room apartment and the fact that [the defendant and his confederate] were secured during the entire time in question, there was no possibility that either one of them could reach deep into the interior of the bed without being stopped. . . ." 78 F.3d at 60.

◼ Under the principles of *Chimel,* as applied in *Blue* and *Hernandez,* the search in this case can be sustained only if the evidence permits a finding that there was some risk the defendant could reach into the area where the gun was located after he was taken away in handcuffs by Officer Barry. The Government urges that a reasonably prudent officer in Deputy Wood's position would believe that the area under the mattress was within the defendant's grab area after he was arrested. Govt.'s Supp. Mem. at 11. In support of this contention, the Government states that "the search through the clothing and underneath the mattress began instantaneously with the defendant's removal from the bed to the corner of the room where the firearm was found and lasted only a

few seconds as the defendant was being escorted around the bed by Officer Barry." *Id.* at 12. I do not agree with the Government's statement of the facts. Deputy Wood began the search after the defendant was handcuffed. *See* Tr. 149–50. His search through the clothing and other items on the floor took more than a few seconds. By his own estimate, the cursory search took nearly a minute. Tr. 147. By the time Deputy Wood lifted the mattress, the defendant was on the opposite side of the bed near the doorway. The defendant was securely under the control of Officer Barry the entire time. On these facts, it cannot be said that the area under the mattress was within the defendant's immediate control as defined in *Chimel.*

In support of its contention that the area under the mattress was properly searched incident to the defendant's arrest, the Government states that "other rooms in the house had not been 'cleared' and third parties could have been hiding in closets or other spaces." Govt.'s Supp. Mem. at 11. The Government's reliance on the risk posed by unseen third parties is unavailing because "the justification for the search incident to arrest considered in *Chimel* [is] the threat posed by the arrestee, not the safety threat posed by the house, or more properly by unseen third parties in the house." *Maryland v. Buie,* 494 U.S. 325, 336, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). More to the point, the evidence discloses no objective basis for a concern about unknown third parties hiding in Ms. Moseley's apartment. When the officers knocked on Ms. Moseley's door, they had no information that anyone other than Ms. Moseley and the defendant might be there. Their interaction with Ms. Moseley before entering the apartment gave them no indication that anyone else was present other than the defendant and Ms. Moseley's son. If anything, Ms. Moseley's cooperation with the officers, her use of a soft voice to prevent the defendant from overhearing,

and her expression of concern about her son's safety indicated that an unidentified third person was unlikely to be present. After entering the apartment, Officer Barry and Deputy Wood walked through the living room and kitchen. Deputy Wood then proceeded toward the bedroom where the defendant was apprehended, while Officer Barry conducted a visual security check of the other bedroom and bathroom. Based on their testimony at the suppression hearing, Officer Barry believed nobody else was in the apartment and Deputy Wood also felt secure at the time.

The Government contends that, in any event, Deputy Wood's search under the mattress may be sustained as a search incident to arrest because the area under the mattress was within the defendant's immediate control just before he was arrested. No Second Circuit precedent is cited in support of the proposition that the area of an arrestee's immediate control under *Chimel* is to be determined based on circumstances that existed just before the arrest rather than at the time of the search. The Government's position is supported, however, by cases decided by other circuits. *See United States v. Williams,* 483 F.3d 425, 430 (6th Cir.2007); *United States v. Abdul–Saboor,* 85 F.3d 664, 668 (D.C.Cir.1996); *United States v. Turner,* 926 F.2d 883, 888 (9th Cir.1991). The approach taken in these cases permits officers to handcuff and remove an arrestee from an area then search the area from within which he could have grabbed a weapon or evidence before he was handcuffed and removed, provided the arrest and search are reasonably contemporaneous or parts of a single transaction. As applied to the facts of the present case, this approach would permit a search of a considerable area in the bedroom after the defendant was taken away in handcuffs, one arguably encompassing not only the bed, the floor around the bed and the area

under the mattress, but also the top of a nearby dresser, possibly one or more dresser drawers, one or two clothes hampers and a closet.

The cases cited by the Government reflect the view that if an area in a dwelling can be lawfully searched under *Chimel* before the arrestee is handcuffed and removed, a subsequent search of the same area should not be considered unreasonable under the Fourth Amendment. "The weakness of this argument," as Justice Scalia has pointed out in another context, "is that it assumes that, one way or another, the search must take place. But conducting a *Chimel* search is not the Government's right; it is an exception—justified by necessity—to a rule that would otherwise render the search unlawful." *Thornton v. United States,* 541 U.S. 615, 627, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004) (Scalia, J., concurring).

■ In *Chimel,* the scope of the search-incident-to-arrest exception was severely curtailed in accordance with two Fourth Amendment principles:

first, that a warrantless search of a home cannot be sustained unless " 'the exigencies of the situation made that course imperative.' " 395 U.S. at 761, 89 S.Ct. 2034 (quoting *McDonald v. United States,* 335 U.S. 451, 455–56, 69 S.Ct. 191, 93 L.Ed. 153 (1948)); and

second, that "the scope of [a] search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." 395 U.S. at 762, 89 S.Ct. 2034 (quoting *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

■ *Chimel* requires officers to abide by these principles when conducting an area search incident to an arrest in a dwelling. If the arrestee is incapable of reaching into an area, a search cannot be justified by the interests in protecting the arresting officer and preserving evidence.

Lacking any such justification, the search can be sustained only if it falls within another exception to the warrant requirement.

The *Chimel* Court pointed out that in *Terry,* decided the previous year, a patdown of a suspect's outer clothing was sustained "because it was 'no more than a protective search for weapons[,]' " *Chimel,* 395 U.S. at 762, 89 S.Ct. 2034 (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. 1868), while in a companion case, *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), a contrary result was reached because the policeman's thrusting of his hand into the suspect's pocket "had been neither motivated by nor limited to the objective of protection. Rather, the search had been made in order to find narcotics, which were in fact found." *Chimel,* 395 U.S. at 762, 89 S.Ct. 2034. The *Chimel* Court stated that "[a] similar analysis underlies the 'search incident to arrest' principle, and marks its proper extent." 395 U.S. at 762, 89 S.Ct. 2034.

The Court then stated:

When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary item must, of course, be governed by a like rule. A gun on a table or drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There

is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The "adherence to judicial processes" mandated by the Fourth Amendment requires no less.

395 U.S. at 762–63, 89 S.Ct. 2034.

■ Since *Chimel* was decided, neither the Supreme Court nor the Second Circuit has approved of a search incident to an arrest in a dwelling in the absence of exigent circumstances.[5] Accordingly, I conclude that the search in this case, like

5. Since *Chimel*, the Supreme Court has held that a lawful custodial arrest entitles officers to conduct a thorough search of the arrestee's person regardless of whether the officers have reason to think the search will uncover a weapon or destructible evidence. *See United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 494, 38 L.Ed.2d 456 (1973). The Court has also held that a lawful custodial arrest of an occupant of a vehicle entitles officers to conduct a full search of the vehicle's passenger compartment. *See New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). The latter rule applies even when the officer does not encounter the arrestee until after the arrestee has left the vehicle. *See Thornton v. United States*, 541 U.S. 615, 623–24, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004). Though these cases depart from the rationale of *Chimel* by permitting searches in the absence of exigent circumstances, they do not signal that a search in a dwelling may be valid under *Chimel* when there is no exigency. The Fourth Amendment permits routine

the search in *Blue*, exceeded the scope of a properly limited search incident to an arrest in a dwelling.[6]

### B. *Special Needs Parole Search*

■ The Government contends that the warrantless search conducted by Deputy Wood was justified by the special needs of the parole system, which require that parolees be subject to searches on no more than reasonable suspicion. The defendant counters that, at the time of the search, no Connecticut statute, regulation, judicial decision, court order or parole condition authorized a search of his residence on less than probable cause. I conclude that, assuming the standard required to justify the search conducted by Deputy Wood is reasonable suspicion, the Government has not met its burden of demonstrating that this standard was satisfied.

In *Griffin v. Wisconsin*, 483 U.S. 868, 872–73, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), the Supreme Court upheld a warrantless search of a probationer's residence based on reasonable suspicion. The

searches of persons and vehicles lawfully in police custody. In the absence of consent, however, a warrantless search in a home requires exigent circumstances.

6. The Government relies on *United States v. Hill*, 2005 WL 3113206,*11 (D.Conn. Nov.18, 2005), which held that a bullet proof vest was properly seized incident to the defendant's arrest in his girlfriend's home because the vest was in plain view when the police entered. Judge Kravitz's opinion states that even if the vest was covered by a sheet, as the defendant claimed, its seizure was permissible incident to the defendant's arrest because it was lying on a couch only two or three feet away from the defendant when he was arrested and placed in handcuffs, and the seizure occurred virtually simultaneously with the arrest. As I read the decision in *Hill*, it is faithful to the Second Circuit's reasoning in *Hernandez* and *Blue*, and does not purport to adopt a more expansive approach to the proper scope of a search incident to arrest.

Court concluded that the state's special need for adequate supervision of the probationer's compliance with probation conditions outweighed the probationer's legitimate expectation of privacy. Ten months later, in *State v. Smith*, 207 Conn. 152, 174, 540 A.2d 679 (1988), the Connecticut Supreme Court held that the standard required by the Fourth Amendment to justify a urinalysis test of a probationer is reasonable suspicion. In addition to *Griffin*, the *Smith* court relied on a Fifth Circuit decision, *United States v. Scott*, 678 F.2d 32, 35 (5th Cir.1982), which held that a parole officer did not violate the Fourth Amendment when, acting on the basis of reasonable suspicion, she obtained incriminating evidence from a parolee during a home visit in order to provide the evidence to postal inspectors conducting a criminal investigation. *Scott*, in turn, relied on a Second Circuit decision, *United States ex rel. Santos v. New York State Board of Parole*, 441 F.2d 1216, 1218 (2d Cir.1971), which upheld a parole officer's search of a parolee's home because there were "reasonable grounds" for investigating his suspected involvement in the sale of stolen goods.

The Government contends that the search conducted by Deputy Wood qualifies as a special needs parole search. But Officer Cartagena was no longer supervising the defendant at the time of the search. The defendant was an absconder whose period of supervision had been tolled pending his apprehension and return to actual custody. Moreover, the parole officers had nothing to do with the searches that took place in Ms. Moseley's apartment. Officer Barry had no interest in searching the premises. As he testified, "All we were there for was to find [the defendant] and take him into custody. We

had done that. The weapon being found is out of our parameters or out of our scope of what we do." Tr. 178. Even after the firearm was discovered, Officer Barry took no part in seeking Ms. Moseley's consent to search the premises because it was outside the "scope" of his work. Tr. 179.

■ Though the special needs rationale is ill-suited to the search in this case, the defendant's diminished expectation of privacy justifies use of a lesser standard than probable cause.[7] In *Samson v. California*, 547 U.S. 843, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006), the Supreme Court upheld a police officer's suspicionless search of a parolee pursuant to a state statute without considering whether the search was justified by a special need under *Griffin*. *See id.* at 852 n. 3, 126 S.Ct. 2193. The Court emphasized that parolees "have severely diminished expectations of privacy by virtue of their status alone." *Id.* at 852, 126 S.Ct. 2193. *See also Griffin*, 483 U.S. at 875, 107 S.Ct. 3164 (parolees are subject to "a degree of impingement upon privacy that would not be constitutional if applied to the public at large"); *U.S. v. Massey*, 461 F.3d 177, 179 (2d Cir.2006)(parolee's reasonable expectation of privacy less than that of ordinary citizen); *U.S. v. Grimes*, 225 F.3d 254, 258 (2d Cir.2000)(parole justifies some departure from traditional Fourth Amendment standards). The Second Circuit has observed that when, as in this case, a parolee is charged with violating his parole conditions and a warrant for his reimprisonment has been issued, the parolee is removed "one step farther from the constitutional protection enjoyed by ordinary citizens." *U.S. v. Polito*, 583 F.2d 48, 55 (2d Cir.1978).

---

7. The defendant's legitimate expectation of privacy as an overnight guest in Ms. Moseley's apartment was no greater than the one he could assert with regard to his approved residence. *See United States v. Taylor*, 482 F.3d 315, 318 (5th Cir.2007).

Assuming that the standard required by the Fourth Amendment to support the search in this instance is reasonable suspicion, the Government has not met its burden of justifying the search. An officer lacks reasonable suspicion for a search unless he is able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. Inarticulate hunches or generalized suspicions are insufficient to provide the minimum level of objective justification required for reasonable suspicion. *See id.* at 27, 88 S.Ct. 1868 (in determining whether officer acted reasonably, due weight must be given, not to his inchoate and unparticularized suspicion or hunch, but to specific reasonable inferences he is entitled to draw from the facts in light of his experience). "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the 'totality of the circumstances'—'the whole picture,' *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), that must be taken into account when evaluating whether there is reasonable suspicion." *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

"A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion...." *United States v. Sokolow*, 490 U.S. 1, 10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). In this case, Deputy Wood did not testify that he believed he had reasonable suspicion to search under the mattress for contraband. His testimony shows that he searched under the mattress simply because it was within the area of the defendant's immediate control just before the arrest. In other words, he conducted a purely exploratory search to see what he might find.

Nonetheless, the Government contends that the search under the mattress was supported by reasonable suspicion. Like probable cause, reasonable suspicion is often based on a tip. *See White* 496 U.S. at 331–32, 110 S.Ct. 2412 (reasonable suspicion based on detailed anonymous tip); *Adams v. Williams*, 407 U.S. 143, 146–47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)(reasonable suspicion based on known informant's tip). A review of reported cases shows that reasonable suspicion to search a parolee's residence has been found when officers acted on the basis of a tip. *See United States v. Blake*, 2008 WL 2610474, *6 (10th Cir. July 3, 2008)(probationer's positive urinalysis combined with information indicating that she and her husband were involved in drug trafficking sufficient to establish reasonable suspicion for search of residence) *State v. Cruz*, 144 Idaho 906, 174 P.3d 876 (Idaho Ct.App.2007)(reasonable suspicion existed to search apartment of parolee's girlfriend based on tip that he was violating his parole conditions by living there and processing and selling drugs). In this case, the officers had no information that the defendant was recently in possession of a firearm or narcotics.

The Government's argument that the officers had reasonable suspicion to search under the mattress boils down to this: (1) the defendant had a criminal record including convictions for possession of a firearm and narcotics; (2) the defendant was an absconder from parole; (3) Ms. Moseley took ten minutes to respond to the officers' knocking at her door; and (4) the mattress was askew. These factors, viewed collectively, did not provide reasonable suspicion that the defendant was hiding a weapon or narcotics under the mattress. The defendant's criminal record and status as an absconder provided no particularized basis for suspecting that he was presently in possession of a weapon or

narcotics. *See United States v. Freeman,* 479 F.3d 743, 749 (10th Cir.2007)(defendant's parolee status and criminal history, without other particularized and objective facts, insufficient to provide reasonable suspicion to conduct search of residence); *United States v. Payne,* 181 F.3d 781, 790–91 (6th Cir.1999)(absconder's past drug offenses did not provide reasonable suspicion to search home); *People v. Lampitok,* 207 Ill.2d 231, 278 Ill.Dec. 244, 798 N.E.2d 91 (2003)(violation of reporting condition does not provide reasonable suspicion to search for drugs). Nor did the delay in opening the door. This leaves only the mattress being askew. The Government's theory appears to be that because the mattress was off-center, an experienced officer could reasonably infer that the defendant had hastily concealed a gun or narcotics under the mattress. In this case, the mattress being askew was insufficient to support such a reasonable inference because the bedroom itself was in a state of disarray and the defendant had ample time to conceal a gun or contraband elsewhere in the apartment.

### III. *Conclusion*

Accordingly, the motion to suppress the pistol is hereby granted.

So ordered.